COMMONWEALTH *vs.* CLIFFORD C., a juvenile.

Suffolk. March 2, 1993. - April 15, 1993.

Present: LIACOS, C.J., NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Delinquent Child. Jurisdiction*, Delinquent child, Transfer hearing, Juvenile delinquency proceedings. *Practice, Criminal*, Juvenile delinquency proceeding, Transfer hearing. *Juvenile Court*, Jurisdiction.

Discussion of the standards governing the determination whether a juvenile should be retained in the juvenile justice system, as set forth in G. L. c. 119, § 61, as amended by St. 1991, c. 488, § 3. [41-43]

At a juvenile transfer proceeding under G. L. c. 119, § 61, in which probable cause as to murder and assault with intent to murder was found in the Part A hearing, the judge's conclusion in the Part B hearing that the juvenile was amenable to treatment in the juvenile justice system was not supported by the judge's subsidiary findings, inasmuch as he failed to take into account or to evaluate most of the statutory factors or evidentiary sources bearing on the risk of recidivism [43-46]; moreover, the judge improperly restricted the Commonwealth and the juvenile from introducing relevant expert psychological evidence on that issue [46-47].

COMPLAINT received and sworn to in the Roxbury Division of the Juvenile Court Department on January 27, 1992.

A transfer hearing was held before *Paul L. McGill*, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Annemarie Relyea-Chew*, Assistant District Attorney (*Robert M. Griffin*, Assistant District Attorney, with her) for the Commonwealth.

*Jay D. Blitzman*, Committee for Public Counsel Services, for the juvenile.

GREANEY, J. The juvenile in this case is charged with murder, and assault with intent to murder, after a violent inci-

dent involving him and three other individuals.[1] See G. L. c. 265, §§ 1 and 15 (1990 ed.). The juvenile was aged sixteen and one-half years at the time of the incident. Pursuant to G. L. c. 119, § 61, as amended by St. 1991, c. 488, § 5, the Commonwealth filed a motion to transfer the juvenile to the Superior Court for trial as an adult.[2] A probable cause (Part A) hearing was held in the juvenile session of the Roxbury Division of the District Court Department. The judge found that probable cause existed with regard to the charges of murder and assault with intent to murder. The transfer (Part B) hearing was held two months later. Shortly after that hearing, the judge entered "Findings and Orders" and denied the Commonwealth's motion to transfer the juvenile to the Superior Court for trial. The Commonwealth filed an appeal from the denial of its motion. See G. L. c. 119, § 61, as amended by St. 1991, c. 488, § 4; G. L. c. 278, § 28E, as amended by St. 1991, c. 488, §§ 11 and 12. We transferred the case from the Appeals Court on our own initiative. We conclude that the judge failed to give appropriate consideration to the Commonwealth's evidence bearing on the juvenile's amenability to rehabilitation within the juvenile justice system and improperly limited the introduction of expert psychiatric evidence. Accordingly, we reverse the order denying transfer and remand the case for further proceedings.

1. (a) *Probable cause (Part A) hearing.* The judge found that probable cause existed to convict the juvenile of murder and assault with intent to murder based on the testimony at the Part A hearing of the surviving stabbing victim, Robert Crayton. Crayton testified that, as he was returning home on

---

[1]The juvenile was also charged with possession of a firearm which had no serial or identification number. G. L. c. 269, §§ 10 (*a*) and 11C (1990 ed.). These charges were dismissed for lack of probable cause after it was found that the firearm in the juvenile's possession was inoperable.

[2]As amended, G. L. c. 119, § 61, provides: "The court shall order a transfer hearing whenever the commonwealth so requests. The court shall order a transfer hearing in every case in which the offense alleged is murder in the first or second degree . . . ."

January 25, 1992, he saw his son in the company of the juvenile and one Kion (or Quion) Wiggins. Crayton approached the group and soon became involved in a fight with Wiggins. While the two were fighting, Crayton saw the juvenile lunge at his son. The juvenile then ran over and stabbed Crayton twice. When Crayton's son tried to protect his father, the juvenile pinned Crayton's son against a fence and stabbed him twice in the heart.[3] Wiggins and the juvenile then teamed up to attack Crayton, punching and kicking him. Finally, the juvenile stabbed Crayton a third time and fled the scene. He was apprehended by police officers a short distance away. A bloody knife was in the juvenile's possession. The juvenile was brought back to the scene, where Crayton identified him as the individual responsible for stabbing him and killing Crayton's son. After the probable cause (Part A) hearing, the judge concluded: "Based upon the evidence presented, and the inferences that may be drawn therefrom, the evidence warrants a finding that [the juvenile] murdered [Crayton's son]. The evidence further warrants a finding that [the juvenile] assaulted Robert Crayton with the intent to murder him." The propriety of these findings is not contested.

(b) *Transfer (Part B) hearing.* It was agreed that a psychologist connected with the Roxbury District Court clinic would perform a diagnostic study of the juvenile pursuant to G. L. c. 119, § 68A (1990 ed.). The juvenile also successfully requested funds to retain two experts, a psychiatrist and a psychologist, in preparation for the Part B hearing. He was examined by these experts and was prepared to offer their testimony. Before the commencement of the Part B hearing, the prosecutor requested that the juvenile submit to a psychiatric examination by an expert of its choice. The prosecutor

---

[3]Either one of these wounds would have been sufficient to cause death. The judge commented: "[T]he forensic evidence shows that [the juvenile's actions] . . . produced two separate six inch deep wounds that perforated [the deceased's] heart. The brutal viciousness of this act is clear. [The juvenile's] multiple crushing death blows to [the deceased's] heart after pursuing and cornering him, an unarmed victim, produced stab wounds substantially deeper than the four inch knife blade itself."

maintained that the Commonwealth's case would be unfairly prejudiced if the juvenile were allowed to present experts of his choice on the issue of amenability to rehabilitation and the prosecution were denied the opportunity to obtain similar evidence to offer in rebuttal. The judge ruled that he would rely on the testimony of the psychologist from the Roxbury District Court clinic. He denied the Commonwealth's motion for a continuance to permit an examination of the juvenile by an expert selected by the Commonwealth, and he also excluded the testimony of the juvenile's two experts on the ground that the testimony would be cumulative.

The evidence introduced at the Part B hearing consisted of the Roxbury District Court clinic psychologist's testimony and written evaluation, testimony from staff members of the Challenge Program (the secure Department of Youth Services [DYS] facility at which the juvenile has been detained pending trial), and from an appointed attorney who had previously represented the juvenile, the juvenile's DYS, probation, and school records, and the transcript of the probable cause (Part A) hearing. The psychologist's report reflected interviews with the juvenile, and members of his family, tests that had been administered to the juvenile, and a review of his school and DYS records. While noting that the juvenile displayed a "limited" degree of remorse for the incident that had led to the pending charges,[4] the psychologist concluded that he was amenable to treatment because of a capacity to form relationships and to empathize with others and an absence of morbid and violent preoccupations, clinical psychosis, or depression.

*2. Transfer decision.* The Part B hearing concerned the threat to the public posed by the juvenile and his amenability

---

[4]The psychologist based her assessment of the juvenile in part on the account he gave to her of the events leading to the charges against him. He maintained that he had been defending himself against what he thought was an assault with a knife. He told the psychologist that the fight was over the firearm that was in his possession when he was arrested. According to the juvenile, he had traded cocaine for the firearm with Robert Crayton and was dismayed to discover that it did not fire.

to rehabilitation within the juvenile justice system. Section 61 of G. L. c. 119, as amended by St. 1991, c. 488, § 3, sets forth the standards governing such a hearing. In deciding whether the juvenile should be retained in the juvenile system and tried as a juvenile, or transferred to the Superior Court and tried as an adult, the judge was required to decide whether the juvenile presented a danger to the public and whether he would be amenable to rehabilitation within the juvenile justice system. Section 61 sets out a nonexhaustive list of factors, or evidentiary sources, which must be taken into account in making a transfer decision. These factors include: "evidence of the nature, circumstances, and seriousness of the alleged offense; the child's court and delinquency record; the child's age and maturity; the family, school and social history of the child; the success or lack of success of any past treatment efforts of the child; the nature of services available through the juvenile justice system; the adequate protection of the public; and the likelihood of rehabilitation of the child."

The transfer hearing is an adversary process which places on the Commonwealth the burden of proving that a juvenile presents a danger to the public and is not amenable to rehabilitation. By recent amendments to § 61, the Legislature clearly has indicated an intent that transfer should occur more readily in cases in which a juvenile is charged with murder or another crime involving violence to a person. In such cases, the Commonwealth's burden of proof is by a preponderance of the evidence as distinguished from clear and convincing evidence which applies in other cases. Section 61 also creates a rebuttable presumption that a juvenile charged with murder (or with another enumerated violent crime) is dangerous to the public and not amenable to rehabilitation. See *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 222-225 (1993); G. L. c. 119, § 61, as amended by St. 1990, c. 267, § 3, and by St. 1991, c. 488, § 6.

Not one of the factors listed in § 61 is conclusive and that statute does not assign particular weight to one factor over the others. A judge has considerable discretion, within the

statutory framework, in making the difficult decision whether to retain or transfer a juvenile defendant. See *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 48 (1992); *Ward* v. *Commonwealth*, 407 Mass. 434, 437-438 (1990); *Two Juveniles* v. *Commonwealth*, 381 Mass. 736, 741 (1980). Notwithstanding the existence of this judicial discretion, a "[s]erious deficiency in the [judge's] subsidiary findings . . . count[s] as a faulty step in the process of transfer," *A Juvenile* v. *Commonwealth (No. 1)*, 380 Mass. 552, 558 (1980), which is correctable on appeal.

Based on the evidence presented at the Part B hearing in this case, the judge concluded that the juvenile posed a danger to the public because "[t]he Commonwealth . . . clearly demonstrated that the [juvenile] is a habitual assaulter, and that the pattern of violence he exhibited has intensified over time. There was evidence that [the juvenile] is a drug dealer and may be involved in gang activity . . . . A Boston School Department [P]sychologist's evaluation indicated that [the juvenile] had aggressive tendencies, impulsive behavior, and low self-esteem. There was an abundance of evidence that [the juvenile's] family situation cannot provide the nurturing, guidance, and control necessary to assure public safety." Turning to the question of the juvenile's amenability to treatment within the juvenile justice system, the judge observed that the juvenile had exhibited no behavioral problems and had performed well academically in the secure DYS facility in which he had been confined since his arrest. Reasoning that the Commonwealth had been "unable to produce any testimony" contradicting or refuting the opinion of the Roxbury Court clinic psychologist, the judge accepted the psychologist's opinion that the juvenile would be amenable to treatment offered in a secure and highly structured environment.[5]

---

[5]General Laws c. 119, § 72, as amended by St. 1991, c. 488, § 7, imposes mandatory sentences on juveniles retained within the juvenile justice system, and adjudicated delinquent by reason of murder in the first degree (twenty years with possibility of parole after fifteen years) or second degree (fifteen years with possibility of parole after ten years). The judge

The finding that the juvenile represented a danger to the public was well supported by the evidence. A young man, like the juvenile, who regularly carries weapons, and as to whom probable cause has been found on charges of murder and attempted murder, clearly presents a danger to the public. We do not think, however, that the subsidiary findings made by the judge adequately support his conclusion that the juvenile can be rehabilitated. In reaching his decision, the judge relied exclusively on the psychologist's evaluation and on the absence of expert psychiatric testimony supporting the Commonwealth's motion to transfer. The judge's written decision indicates that he failed to take into account, or to evaluate, most of the statutory factors or evidentiary sources that the Legislature directed to be considered in determining whether a juvenile poses a risk of recidivism.

This court and the Appeals Court have affirmed decisions finding juveniles not amenable to rehabilitation based on evidence of: (1) the lack of success of previous treatment efforts, see *Ward* v. *Commonwealth, supra* at 439; *Commonwealth* v. *Costello,* 392 Mass. 393, 396 n.2 (1984); *Two Juveniles* v. *Commonwealth, supra* at 744; *Commonwealth* v. *Traylor,* 29 Mass. App. Ct. 584, 588 (1990); (2) a juvenile record involving violence to persons, see *Ward* v. *Commonwealth, supra* at 439; *Commonwealth* v. *Traylor, supra* at 587-588; (3) a lack of academic effort, persistent truancy, and disciplinary problems at school, see *Commonwealth* v. *DiBenedetto, supra* at 49; *Ward* v. *Commonwealth, supra* at 439; *Commonwealth* v. *Costello, supra* at 396 n.2; *Commonwealth* v.

---

opined that the new mandatory sentences, which would be imposed if the juvenile was retained in the juvenile justice system and adjudicated delinquent by reason of murder, ameliorated concerns about the juvenile's dangerousness and his amenability to rehabilitation. One of the statutory factors the judge must consider in determining whether to transfer a juvenile for trial as an adult is "the nature of services available through the juvenile justice system." G. L. c. 119, § 61. We agree with the judge that he could take into account the length of the possible sentence that might be imposed on the juvenile, and the nature of the treatment options provided by the Department of Correction, as well as the juvenile justice system, in determining whether the juvenile posed a risk of recidivism.

*Watson*, 388 Mass. 536, 539 (1983); *Two Juveniles* v. *Commonwealth*, *supra* at 743-744; (4) a history of substance abuse, see *Ward* v. *Commonwealth*, *supra* at 439; and (5) the absence of an intact family to support rehabilitative efforts, see *Commonwealth* v. *DiBenedetto*, *supra* at 48-49. The judge had before him, but did not adequately consider, evidence bearing on these considerations.

The juvenile's court record reveals four arrests for assault and battery, one of which was for an assault and battery on a school teacher. Two of the assaults involved robbery. The juvenile defaulted on numerous court appearances. When he was adjudicated delinquent and committed to DYS custody in 1991, he was placed in Casa Rafael, a nonsecure DYS facility. While there, "he tried to remove himself from programmatic things like schooling." He ran away from the facility and did not respond to telephone calls made by DYS personnel attempting to locate him. As the judge noted, the juvenile's probation officer at the Roxbury District Court concluded that the juvenile was not suitable for probation because he had defaulted five times, refused to cooperate with the court clinic, did not attend school, and did not observe his curfew. The juvenile admitted to the psychologist to selling crack cocaine regularly, to smoking marihuana on a daily basis, and to drinking alcohol regularly, primarily on the weekends.

The juvenile began missing school in the sixth grade. From that point on, his behavioral problems in school became acute: he was regularly truant; he assaulted a teacher; he carried a knife on school premises; and he was reported by school authorities to be generally inappreciative, undisciplined, and disrespectful of authority. In tests conducted by the Roxbury District Court clinic, the juvenile tested at a third grade level for verbal skills and an eighth grade level for skills in mathematics. The juvenile's mother had been addicted to cocaine since the juvenile was seven or eight years old. The juvenile had lived with an aunt since he was twelve after a fire destroyed his family's apartment. Although his aunt provided the juvenile with basic necessities, and indi-

cated affection for him, she told the Roxbury District Court clinic psychologist that because she was not the juvenile's legal guardian, she felt unable to become involved with his academic and legal problems. The judge considered the evidence outlined above in reaching his conclusion that the juvenile was dangerous to the public. Massachusetts case law and the governing legislation establish that this evidence was even more relevant to the issue of the juvenile's amenability to rehabilitation, and the evidence should have been considered by the judge before the transfer decision was reached.[6]

The Commonwealth and the juvenile also should have been permitted to introduce additional expert psychiatric testimony. We indicated in *Commonwealth* v. *Wayne W.*, 414 Mass. 218, 230-231 (1993), that, if a juvenile chooses at a Part B (transfer) hearing to introduce expert psychiatric evidence reflecting his statements to an expert, the juvenile has waived his privileges against self-incrimination and can be compelled, on the Commonwealth's motion, to submit to an examination by an expert designated by the Commonwealth. We also noted, in the *Wayne W.* decision, "the distorting effect on the fact finder's role, if only one party can introduce expert testimony on a crucial issue." *Id.* at 231. The Roxbury District Court clinic psychologist's testimony reflected extensive interviews with the juvenile, and she was called by him as a witness at the transfer hearing. The judge's ruling excluding other expert testimony impermissibly restricted the Commonwealth from obtaining and introducing comparable evidence to which it was entitled.

In so limiting the expert testimony, and relying exclusively on the examination by the Roxbury District Court clinic psychologist, the judge desired to avoid "a battle of the experts" and the introduction of evidence he thought might be cumu-

---

[6]We note as well that the Commonwealth is not required to produce expert psychiatric testimony to prove that the juvenile is not amenable to rehabilitation, nor is the judge bound by the testimony of such experts. See *Ward* v. *Commonwealth, supra* at 439; *Commonwealth* v. *Costello*, 392 Mass. 393, 397 (1984); *Commonwealth* v. *Watson*, 388 Mass. 536, 539 (1983); *Two Juveniles* v. *Commonwealth*, 381 Mass. 736, 744-745 (1980).

lative. This approach, however, eventually turned the transfer hearing into something approaching a game of chance, the outcome of which depended on the views of a single evaluation when both sides wanted additional expert testimony. The psychologist who performed the evaluation, although properly accepted as an expert by the judge, had limited experience in assessing the rehabilitative potential of juveniles charged with serious crime.[7] In these circumstances, the judge could have benefited from a range of professional opinions addressing the juvenile's amenability to rehabilitation.

3. *Disposition.* The order denying the Commonwealth's motion to transfer is reversed. The case is remanded to the juvenile session of the Roxbury District Court for further proceedings consistent with this opinion, including an examination of the juvenile by the Commonwealth's expert, the introduction of such additional psychiatric testimony as both parties desire, and a redetermination of the issue of the juvenile's amenability to rehabilitation.

*So ordered.*

---

[7]We do not agree with the judge that the testimony of the juvenile's two expert witnesses would have been cumulative, in view of the testimony offered by the Roxbury District Court clinic psychologist. One of the juvenile's experts was a psychiatrist. The juvenile's representation, on the record, was that these experts were experienced in assessing the rehabilitative potential of juveniles, and familiar with DYS treatment resources. Section 61 placed on the juvenile the initial burden of producing evidence of his amenability to treatment. *Commonwealth* v. *Wayne W., supra* at 223-224. He must be allowed to present competent evidence on this point.