## COMMONWEALTH vs. JAVON WALCZAK.

Essex. May 8, 2012. - December 12, 2012.

Present: IRELAND, C.J., SPINA, CORDY, BOTSFORD, GANTS, DUFFLY, & LENK, JJ.

*Homicide. Practice, Criminal,* Dismissal, Indictment, Grand jury proceedings. *Grand Jury. Evidence,* Self-defense. *Self-Defense. Delinquent Child. Youthful Offender Act.*

This court affirmed an order of a judge in the Superior Court dismissing an indictment that charged a defendant, who was sixteen years old at the time of the offense, with murder in the second degree, and stated that, in future cases where the Commonwealth seeks to indict a juvenile for murder and where there is substantial evidence of mitigating circumstances or defenses (other than lack of criminal responsibility) presented to the grand jury, the prosecutor shall instruct the grand jury on the elements of murder and on the significance of the mitigating circumstances and defenses, and the instructions are to be transcribed as part of the transcription of the grand jury proceedings. [809-810]

LENK, J., was of the view that, although the evidence before the grand jury supported the indictment for murder in the second degree, where, as here, the Commonwealth seeks to indict a juvenile for murder, the grand jury must be properly instructed by the prosecutor on the elements of murder, and if there are mitigating circumstances and defenses (other than lack of criminal responsibility) raised by the evidence, the grand jury must be instructed as to those as well. [810-836]

GANTS, J., concurring, with whom BOTSFORD and DUFFLY, JJ., joined, was of the view that where the Commonwealth seeks an indictment for murder and there is substantial evidence before the grand jury of mitigating circumstances (other than lack of criminal responsibility) — evidence sufficiently strong that the integrity of the grand jury would be impaired if it were withheld — the grand jury must be instructed on the elements of murder and on the mitigating circumstances and defenses, regardless of whether the subject of the grand jury's investigation is a juvenile or an adult. [836-844]

SPINA, J., concurring in part and dissenting in part, with whom IRELAND, C.J., and CORDY, J., joined, agreed that the evidence before the grand jury in the instant case supported the indictment for murder in the second degree, did not subscribe to the view that instructions to the grand jury on mitigating circumstances and defenses were necessary in this case, and would make no change in the existing law concerning grand jury procedure in such cases. [844-856]

INDICTMENTS found and returned in the Superior Court Department on May 27, 2011.

A motion to dismiss was heard by *Timothy Q. Feeley*, J.

The Supreme Judicial Court granted an application for direct appellate review.

*Catherine Langevin Semel*, Assistant District Attorney, for the Commonwealth.

*Jonathan Shapiro* (*John Cushman* with him) for the defendant.

By the Court. The Commonwealth appeals from an order of a judge in the Superior Court dismissing an indictment that charged the defendant with murder in the second degree. There was evidence before the grand jury that the defendant, who was sixteen years old at the time of the offense, stabbed the victim, Rene Valdez, in an altercation that began when the victim and an accomplice attempted to rob the defendant. The judge dismissed the indictment on the ground that the Commonwealth had presented insufficient evidence to the grand jury to support an indictment of murder in the second degree. See *Commonwealth v. McCarthy*, 385 Mass. 160 (1982). We granted the defendant's application for direct appellate review and now affirm the order dismissing the indictment.

The court unanimously agrees with the Commonwealth, contrary to the Superior Court judge's ruling, that the evidence before the grand jury supported the indictment for murder in the second degree. On this point, all Justices agree with the reasoning set forth in part 3.b of Justice Lenk's concurring opinion, *post* at 817-822 (Lenk, J., concurring). Four Justices also agree with the defendant, however, that there is an alternative basis on which to uphold the judge's order: namely, that the grand jury should have been, but were not, instructed by the prosecutor on the elements of murder and on the legal significance of the mitigating circumstances raised by the evidence. The Justices who subscribe to this result do so for differing reasons. As reflected in her opinion, Justice Lenk is of the view that, in any case where the Commonwealth seeks to indict a juvenile for murder, the grand jury must be properly instructed by the prosecutor on the elements of murder, and if there are mitigating circumstances and defenses (other than lack of criminal responsibility) raised by the evidence, the grand jury must be instructed as to those as well. As explained in his opinion, Justice Gants, joined by Justices Botsford and

Duffly, would hold that in cases where the Commonwealth seeks an indictment for murder and there is substantial evidence before the grand jury of mitigating circumstances or defenses (other than lack of criminal responsibility) — evidence sufficiently strong that the integrity of the grand jury would be impaired if it were withheld — the grand jury must be instructed on the elements of murder and on the mitigating circumstances and defenses, regardless of whether the subject of the grand jury's investigation is a juvenile or an adult. *Post* at 837 (Gants, J., concurring).

Three Justices, Justice Spina, joined by Chief Justice Ireland and Justice Cordy, do not agree with the alternative basis for upholding the order dismissing the indictment. They do not subscribe to the view that instructions to the grand jury on mitigating circumstances and defenses were necessary in this case, and they would make no change in the existing law concerning grand jury procedure in cases such as this. These Justices would vacate the order dismissing the indictment and remand the case to the trial court for further proceedings. *Post* at 844 (Spina, J., concurring in part and dissenting in part).

By a majority of the court, therefore, the order dismissing the indictment is affirmed. In future cases, where the Commonwealth seeks to indict a juvenile for murder and where there is substantial evidence of mitigating circumstances or defenses (other than lack of criminal responsibility) presented to the grand jury, the prosecutor shall instruct the grand jury on the elements of murder and on the significance of the mitigating circumstances and defenses. The instructions are to be transcribed as part of the transcription of the grand jury proceedings.

*So ordered.*

LENK, J. (concurring). A grand jury twice returned indictments against the defendant, who was sixteen years old at the time of his alleged offense, for murder in the second degree in the killing of Rene Valdez. See G. L. c. 265, § 1. Twice, the same Superior Court judge dismissed the indictment; the first time because the grand jury proceedings had been impaired by

the prosecutor's failure to disclose certain exculpatory evidence, see *Commonwealth* v. *O'Dell*, 392 Mass. 445, 446-447 (1984), and the second time on the ground of insufficient evidence. See *Commonwealth* v. *McCarthy*, 385 Mass. 160 (1982). This is the Commonwealth's appeal from the second dismissal.

As explained below, the evidence was sufficient to support the indictment. The Commonwealth offered evidence to prove the two elements of murder in the second degree: an unlawful killing committed with malice. See *Commonwealth* v. *Earle*, 458 Mass. 341, 346 (2010). The defendant contends that his actions were undertaken in a heat of passion arising from reasonable provocation or sudden combat, or constituted excessive use of force in self-defense, but in evaluating the sufficiency of the evidence before the grand jury, we view the evidence of mitigating circumstances in the light most favorable to the Commonwealth and recognize that the grand jury need not credit such evidence. See *Commonwealth* v. *Silva*, 455 Mass. 503, 511 (2009) (Commonwealth bears no burden in its presentment to grand jury to disprove mitigating circumstances).

Unlike indictments for all other crimes, however, an indictment for murder brought against a juvenile defendant carries an added and significant consequence. A murder indictment must be tried in the Superior Court "in accordance with the usual course and manner of criminal proceedings," G. L. c. 119, § 74, and the juvenile defendant will be treated in all respects as an adult. If indicted for any other crime, the juvenile defendant would otherwise proceed in the Juvenile Court, with the protections there afforded him. The decision to indict for murder and bypass the Juvenile Court is now made by the grand jury without taking the defendant's youth into consideration in any way, a procedure that is in tension with significant considerations recognized in recent decisions of the United States Supreme Court. See *Miller* v. *Alabama*, 132 S. Ct. 2455, 2469 (2012); *Graham* v. *Florida*, 130 S. Ct. 2011, 2026 (2010); *Roper* v. *Simmons*, 543 U.S. 551, 564, 569 (2005). In view of the critical role of the grand jury in these unique circumstances, I think it prudent to factor the defendant's status as a juvenile into the murder indictment process, and I would do so by the simple expedient of requiring that appropriate legal instructions be

provided to the grand jury. Specifically, I would require that in all cases where the Commonwealth seeks to indict a juvenile for murder, legal instructions be provided to the grand jury as to the elements of the crime for which an indictment is sought, as well as any mitigating circumstances or defenses raised by the evidence. Because no such instructions were provided here, the indictment was properly dismissed.

1. *Presentment to the second grand jury.* The evidence presented to the second grand jury, in the light most favorable to the Commonwealth, indicated the following.[1] See *Commonwealth* v. *Catalina*, 407 Mass. 779, 781 (1990). On August 9, 2010, the victim, along with his cousin, Jose Valdez, his friend Darren Colucci, and five other friends, went to a neighborhood park in Lynn at around 9:30 P.M. to play a game of football.[2] After about forty-five minutes, they returned to Jose's home.

At some point during the evening, the victim telephoned the defendant to ask about buying marijuana; the defendant previously had sold marijuana to the victim. After the football game, the victim telephoned the defendant to decide on a place to meet. Darren agreed to accompany the victim to the arranged location. The victim was "trying to rob" the defendant, so he and Darren could "get the [marijuana] without paying for it." The victim repeated that he would "handle" and "body" the defendant.[3] Although Jose tried to dissuade the victim from robbing the defendant, the victim and Darren left Jose's house to meet the defendant. Neither the victim nor Darren was armed.[4]

---

[1]Two witnesses testified before the grand jury: Detective Steven Pohle of the Lynn police department, and State Trooper Anthony Lopilato of the Essex County district attorney's office. Pohle testified about the investigative process leading to the defendant's arrest. Pohle, in a responsive question and answer with the prosecutor, also read the testimony of Jose Valdez and Darren Colucci from the transcript of the first grand jury presentment. Lopilato did the same with respect to the previous grand jury testimony of Cody Potter, Edward Rodriguez, and Aramis Llano, three eyewitnesses to the altercation. Lopilato also testified as to the contents of the autopsy report.

[2]Because all of the participants in the altercation were of high school age at the time, and two share a last name, I refer to them by their first names.

[3]According to the testimony of one of the victim's friends before the first grand jury, which was admitted as an exhibit during the second presentment, the victim planned to rob the defendant because the victim and his friends thought the defendant was a "punk" and a "nerd" who "can't fight back."

[4]While I summarize the evidence in the light most favorable to the Com-

Darren and the victim rode their bicycles to the location where they had mutually agreed to meet the defendant. After the victim contacted the defendant, they agreed to meet at another location, the corner of High Rock Street and Lawton Avenue. When they arrived, the defendant was waiting for them.

The victim approached the defendant from the front, while Darren approached from behind.[5] According to Darren's testimony, the victim was telling the defendant that they "were going to take [the marijuana] without paying." Darren himself proceeded to poke the defendant in the head with his fingers and tell him, "We're taking it." After Darren poked him, the defendant "attacked [the victim]." He swung at the victim, and the victim swung back. During the scuffle, Darren "was pulling [the defendant] off and trying to get him off [the victim]." Darren saw the defendant take out something — he "didn't know if it was a knife" at that time. Darren then "punched [the defendant] in his eye and then [Darren] got out of the way." At that point, the defendant "charged" at the victim. While the defendant was on top of the victim, Darren began "punching him in his head" until he got off. Darren himself was stabbed at this time, but he did not realize it until he was riding away on his bicycle.

Twelve year old Aramis Llano lived nearby and saw much of what transpired. Hearing noises outside his window, Llano looked out to see what was happening. He saw "three kids arguing": the one closest to him was "fat" with "[b]ushy" hair,

---

monwealth, I note that Jose was inconsistent in his statements concerning whether Darren was armed when Darren and the victim went to meet the defendant. During the first presentment, Jose told the grand jury that Darren was unarmed. Immediately after the killing, however, Jose had told police that Darren was carrying a gun when he and the victim went to meet the defendant. The first indictment was dismissed because the prosecutor failed to present this exculpatory evidence to the grand jury, since the evidence would have constituted impeachment of Darren's own testimony, and Darren was a vitally important witness for the Commonwealth. During the second presentment, the prosecutor both asked a police officer about Jose's statement and admitted the full transcript of the police interview for the grand jury's consideration.

[5] All or part of the altercation was witnessed by four individuals whose testimony was admitted before the grand jury: Darren; Aramis Llano, who lived in a house overlooking the scene; and Edward Rodriguez and Cody Potter, who happened to be driving past the scene at the time of the incident.

the boy in the middle had long hair in a ponytail, and the third had a "black" skin color.[6] Llano then saw the larger boy "thr[o]w a punch" at the boy with the ponytail. After a series of punches, he "saw the large kid take out a knife" and stab the boy with the ponytail in the neck. Llano reported only "seeing him get stabbed once." He saw no other weapons except for the knife.

Cody Potter and Edward Rodriguez saw the interaction while they were driving through the intersection. Potter testified that he saw "two skinny kids and one heavyset kid" enter the intersection in the middle of an argument. The heavyset kid was walking backward while the two skinny kids were walking toward him. The two skinny kids then "started throwing punches." As he tried to drive past them he "noticed the heavyset kid had a knife in his hand." After the two other boys fled, Potter saw that the victim was bleeding. He or Rodriguez dialed 911. Rodriguez's testimony largely confirmed the details as recounted by Potter — including that he saw two "skinny" kids fighting with a "fat" kid and that the "fat" kid was "backing up" away from the other two — but Rodriguez did not see the knife.

Police officers arrived at the scene at 11:15 P.M. The victim was bleeding from his neck, and the officers provided medical care until emergency medical technicians arrived. The victim died later that evening. According to the autopsy report, the victim suffered "eleven total sharp wounds of the body," and the cause of death was "[s]tab wounds of [the] neck and torso with injuries of [the] lung, liver, and large blood vessels."

Police officers were able to link the defendant to the scene through the victim's cellular telephone; the victim had recently made a number of calls to a telephone number registered to the defendant's mother. Darren identified the defendant from a photographic array, stating that he was "positive" that the person identified had stabbed the victim. Another of the victim's friends identified the defendant as the person from whom he and the victim recently had purchased marijuana.

The defendant was arrested the day after the stabbing. After police requested his mother's consent to search their house, the

---

[6]Darren testified that the defendant was "[c]hubby with curly hair," and that the victim had "long hair" that was in a ponytail.

defendant said, "I don't have it. I got rid of it." When asked what he was referring to, the defendant said, "The knife."

2. *Prior proceedings.* On the night of the killing, the defendant was sixteen years old. Indictments were first returned against the defendant on October 27, 2010, charging him with murder in the second degree of Rene Valdez, G. L. c. 265, § 1, armed assault with intent to murder Darren, G. L. c. 265, § 18, and assault and battery by means of a dangerous weapon of Darren. G. L. c. 265, § 15A (*b*). The defendant moved to dismiss the indictment charging him with murder in the second degree on the grounds of both insufficient evidence and because the integrity of the grand jury proceedings had been impaired by the failure of the prosecutor to disclose exculpatory evidence — that evidence being Jose's statement to police that he had seen Darren in the possession of a gun earlier that evening. See note 4, *supra.*

On May 20, 2011, a Superior Court judge allowed the defendant's motion to dismiss the murder indictment without prejudice. The judge ruled that, although the probable cause standard had "barely" been met, and the evidence was thus sufficient, the indictment should be dismissed because "[t]he Commonwealth knowingly or recklessly presented unfair, incomplete, and misleading evidence to the grand jury." The judge concluded that it was improper for the prosecutor to have elicited from Jose that Darren had not had a gun when the prosecutor knew that Jose had previously made a contrary statement. According to the judge, the withheld evidence — that Jose had earlier told police that Darren was in possession of a gun — was directly relevant to the issues in the case and critically important to the grand jury's decision whether to indict.[7]

The case was presented to another grand jury on May 25 and 27, 2011. This time, the Commonwealth introduced the complete police interviews of Jose, and specifically drew the grand jury's attention to his inconsistent statement with respect to Darren's possession of a gun. The grand jury returned both indictments sought by the Commonwealth: one for murder in the second

[7]The indictment charging assault and battery by means of a dangerous weapon was dismissed the same day, and the armed assault with intent to murder indictment was dismissed by agreement of the parties on July 20, 2011.

degree of Rene Valdez, G. L. c. 265, § 1, and another for assault and battery by means of a dangerous weapon of Darren. G. L. c. 265, § 15A (*b*).[8] The defendant brought a second motion to dismiss the murder indictment, on the basis that the grand jury had been presented with insufficient evidence to support a charge of murder in the second degree.[9]

After a nonevidentiary hearing, the same judge allowed the defendant's motion. In a comprehensive memorandum of decision, the judge explained that he had "reconsider[ed his] prior ruling" as to the sufficiency of the evidence,[10] and concluded that the evidence was insufficient to support a finding of probable cause for murder in the second degree. The judge identified a "single and consistent version of the events on the night in question": "The knife was pulled during what had started as a fist-fight as part of or in response to the attempted robbery." According to the judge, the grand jury did not hear any evidence that would suggest that the defendant had not acted on reasonable provocation or sudden combat, either of which mitigate murder to voluntary manslaughter. The inability of the Commonwealth to disprove either of these mitigating circumstances, by any evidence brought before the grand jury, required dismissal of the indictment charging murder in the second degree.

3. *Discussion.* a. *Standard of review.* In general, a "court will not inquire into the competency or sufficiency of the evidence before the grand jury." *Commonwealth* v. *McCarthy*, 385 Mass. 160, 161-162 (1982) (*McCarthy*), quoting *Commonwealth* v. *Robinson*, 373 Mass. 591, 592 (1977). As "an exception to that rule," *Commonwealth* v. *Moran*, 453 Mass. 880, 884 (2009), *McCarthy* set the standard for sustaining an indictment against

---

[8] The Commonwealth did not seek another indictment for armed assault with intent to murder.

[9] The defendant also moved to dismiss the indictment because "the integrity of the grand jury proceedings was impaired by the failure of the prosecutor to instruct the grand jury with respect to voluntary manslaughter and self-defense and to provide the grand jury with any alternative to second degree murder." The judge declined to find any such violation, preferring instead to premise his decision on the insufficiency of the evidence.

[10] The judge held explicitly that he was not changing the decision because of the more complete presentation of Jose's previous statements, but instead had simply concluded that he erred in his earlier decision on the defendant's motion after the first presentment.

a sufficiency of the evidence challenge: "the grand jury must hear sufficient evidence to establish the identity of the accused, . . . and probable cause to arrest him" for the crime charged. *McCarthy, supra* at 163. "Probable cause requires sufficient facts to warrant a person of reasonable caution in believing that an offense has been committed . . . ." *Commonwealth* v. *Levesque*, 436 Mass. 443, 447 (2002), citing *Commonwealth* v. *Catalina*, 407 Mass. 779, 790 (1990). This calls for "something definite and substantial, but not a prima facie case of the commission of a crime, let alone a case beyond a reasonable doubt." *Commonwealth* v. *Bond*, 375 Mass. 201, 210 (1978).

This standard is "considerably less exacting than a requirement of sufficient evidence to warrant a guilty finding." *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984). To survive a motion to dismiss, the grand jury must simply be presented with evidence supporting a finding of probable cause as to "each of the . . . elements" of the charged crime. *Commonwealth* v. *Moran, supra.*

As stated, I consider the evidence in the light most favorable to the Commonwealth, *Commonwealth* v. *Levesque, supra* at 444, and, because "we consider ourselves in as good a position as the motion judge to assess" the evidence before the grand jury, *Commonwealth* v. *Silva*, 455 Mass. 503, 526 (2009), quoting *Commonwealth* v. *Haley*, 413 Mass. 770, 773 (1992), I do not defer to his factual findings or legal conclusions.

b. *Sufficiency of the evidence.* The defendant challenges the sufficiency of the evidence with respect to the indictment for murder in the second degree. "The elements of murder in the second degree are (1) an unlawful killing and (2) malice." *Commonwealth* v. *Earle*, 458 Mass. 341, 346 (2010), citing Model Jury Instructions on Homicide 20 (1999). The first element, "[a]n unlawful killing[,] is a killing done without excuse." Model Jury Instructions on Homicide 8 (1999). If the evidence indicates that the killing may be justified — either because of self-defense, defense of another, or accident — and the Commonwealth cannot disprove that justification beyond a reasonable doubt, the killing is not unlawful. A lawful killing must be

"excused," *id.*; that is, the presence of mitigating circumstances does not render a killing lawful.[11]

The second element of murder in the second degree, malice, "can be established by proving any of three facts, or 'prongs': (1) the defendant intended to cause the victim's death; (2) the defendant intended to cause grievous bodily harm to the victim; or (3) the defendant committed an intentional act which, in the circumstances known to the defendant, a reasonable person would have understood created a plain and strong likelihood of death." *Commonwealth* v. *Earle, supra*, citing *Commonwealth* v. *Grey*, 399 Mass. 469, 470 n.1 (1987).

The testimony before the second grand jury was sufficient to satisfy the probable cause standard with respect to both elements. As to the unlawfulness of the killing, on this evidence, the only possible justification would be self-defense. However, "[e]vidence that the defendant [acted] in self-defense need not preclude an indictment charging murder." *Commonwealth* v. *Silva, supra* at 511. In any event, to justify the use of deadly force, a defendant must believe that he is in "imminent danger of death or serious bodily harm," *Commonwealth* v. *Pike*, 428 Mass. 393, 396 (1998), quoting *Commonwealth* v. *Harrington*, 379 Mass. 446, 450 (1980), must "avail[] himself of all proper means to avoid physical combat before resorting to the use of deadly force," *Commonwealth* v. *Pring-Wilson*, 448 Mass. 718, 733 (2007), quoting *Commonwealth* v. *Harrington, supra*, and must not be the first aggressor in the altercation. See *Commonwealth* v. *Pring-Wilson, supra* at 733-736.

Darren testified that he and the victim had initially threatened the defendant orally, in addition to poking him in the back of the head; multiple witnesses stated that the defendant threw the first punch. The altercation took place in a public intersection, from which the defendant might have been able to flee. Even assuming for the sake of argument that the Commonwealth bears any burden to disprove self-defense before the grand jury,

---

[11]The model jury instructions define both voluntary and involuntary manslaughter as unlawful killings. Model Jury Instructions on Homicide 32, 34 (1999). See *Commonwealth* v. *Rodriquez*, 461 Mass. 100, 107 (2011), quoting *Commonwealth* v. *LeClair*, 445 Mass. 734, 740 (2006) ("A verdict of manslaughter 'depends on evidence, not always necessarily present in murder, [that will, if sufficient,] mitigate, but not excuse, an unlawful killing' ").

I am satisfied that, on this testimony, that burden was met and the grand jury could conclude that the killing was unlawful.

There was also sufficient evidence to establish probable cause that the defendant acted with malice. Malice may be inferred from the intentional use of a dangerous weapon, *Commonwealth v. Guy*, 441 Mass. 96, 107 (2004), and the number of wounds resulting from the use of that weapon. See *Commonwealth v. Richard*, 377 Mass. 64, 66 (1979). Here, the use of a knife to inflict eleven stab wounds, a number of which were in the victim's neck, was sufficient evidence from which the grand jury could have inferred malice. See *Commonwealth v. Stroyny*, 435 Mass. 635, 649 (2002), quoting *Commonwealth v. Pike*, 431 Mass. 212, 216 (2000). ("The nature of the killing, repeated stabbings toward the victim's heart and lungs, displayed malice 'in the plainest sense' ").

In allowing the defendant's second motion to dismiss, the judge acknowledged these first two elements of murder in the second degree, but also added a third: "the absence of reasonable provocation/sudden combat" and, as a result, concluded that the Commonwealth had presented insufficient evidence as to this element. The absence of reasonable provocation or sudden combat is not a third element of murder in the second degree.[12] See *Commonwealth v. Ware*, 438 Mass. 1014, 1015 (2003); Model Jury Instructions on Homicide, *supra* at 20-22. Rather, the presence of either reasonable provocation or sudden combat mitigates murder to voluntary manslaughter, because "[i]f a person kills another in the heat of passion, which is occasioned by adequate and reasonable provocation, or in sudden combat, then even though that person had an intent to kill, the killing is designated manslaughter and not murder because of the mitigating circumstances." *Commonwealth v. Acevedo*, 427 Mass. 714, 716 (1998). Reasonable provocation includes some-

---

[12]Although we have described voluntary manslaughter as "an unlawful killing which occurs in circumstances which negate the element of malice," *Commonwealth v. Squailia*, 429 Mass. 101, 109 (1999), in the very same opinion, we clarified that voluntary manslaughter involves an "intentional killing[] which is mitigated by extenuating circumstances." *Id.* Implicit in a verdict of voluntary manslaughter is sufficient evidence to establish the elements of murder. See *Commonwealth v. Whitman*, 430 Mass. 746, 752 n.11 (2000); *Ariel A. v. Commonwealth*, 420 Mass. 281, 286 (1995).

thing that would "produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint." *Commonwealth v. Walden*, 380 Mass. 724, 728 (1980), citing *Commonwealth v. Rooney*, 365 Mass. 484, 494-495 (1974). Sudden combat is among those circumstances constituting reasonable provocation, see *Commonwealth v. Walden, supra* at 727-728, and has been described as "[w]hen two meet, not intending to quarrel, and angry words suddenly arise, and a conflict springs up in which blows are given on both sides, without much regard to who is the assailant. . . ." *Commonwealth v. Clemente*, 452 Mass. 295, 320 (2008), cert. denied, 555 U.S. 1181 (2009), quoting *Commonwealth v. Webster*, 5 Cush. 295, 308 (1850).

The grand jury heard evidence of sudden combat. They heard that the victim and Darren intended to rob the defendant and informed him of that fact while positioning themselves on either side of him. When a fight ensued, in which blows were exchanged on both sides, the outnumbered defendant pulled a knife and stabbed the victim. See *Commonwealth v. Berry*, 431 Mass. 326, 334-335 (2000) (evidence of fight, initiated by victim, including victim hitting defendant with bottle permits voluntary manslaughter instruction).

However, the exchange of blows does not mean that a killing should be mitigated to voluntary manslaughter by reason of sudden combat as a matter of law. *Commonwealth v. Walden, supra* at 727, citing *Commonwealth v. Rembiszewski*, 363 Mass. 311, 321 (1973). The question necessarily becomes whether *this* exchange of blows satisfies the standard of reasonable provocation — i.e., "would have been likely to produce in an ordinary person such a state of passion, anger, fear, fright, or nervous excitement as would eclipse his capacity for reflection or restraint, and that what happened actually did produce such a state of mind in the defendant." *Commonwealth v. Walden, supra* at 728, citing *Commonwealth v. Rooney, supra.*

In evaluating the sufficiency of the evidence before the grand jury, I recognize that a grand jury need not credit the testimony before them concerning the potentially provocative circumstances with which the defendant was confronted. If the Commonwealth has put forward evidence indicative of the defendant's intent to

kill (i.e., malice), but also of reasonable provocation, the grand jury (like the petit jury) are free to disregard the latter and embrace the former, and thereby return an indictment for murder. Cf. *Commonwealth* v. *Jefferson*, 416 Mass. 258, 267-268 (1993). Cf. also *Ariel A.* v. *Commonwealth*, 420 Mass. 281, 286 (1995). Imposing a burden on the Commonwealth to disprove mitigating circumstances would call for post hoc judicial reweighing of the evidence before the grand jury rather than a proper assessment of its sufficiency.

In any event, we have never before required the Commonwealth to disprove mitigating circumstances before the grand jury. "The Commonwealth is not required to present evidence of so-called defenses or otherwise disprove such matters before the grand jury." *Commonwealth* v. *Silva*, 455 Mass. 503, 511 (2009). Since reasonable provocation and sudden combat are properly considered a mitigating circumstance rather than an element of murder in the second degree, the Commonwealth need not present evidence to disprove such matters before the grand jury.[13]

At the grand jury stage, the Commonwealth's burden is only to produce evidence as to every element of the charged offense here, an unlawful killing committed with malice sufficient to support a finding of probable cause and the identity of the accused.[14] *Commonwealth* v. *Moran*, 453 Mass. 880, 883 (2009). Because, as stated, the evidence was sufficient to establish these

---

[13]We have previously held that the existence of a valid affirmative defense can obviate probable cause to arrest. See *Commonwealth* v. *Landry*, 438 Mass. 206, 211 (2002). That case involved whether police had probable cause to arrest an individual for illegal possession of a hypodermic needle when she produced a facially valid needle exchange program membership card (which entitles the member to possess hypodermic needles). Where the presentation to the grand jury includes undisputed evidence of such an objective manifestation of the legality of the individual's conduct, the evidence is insufficient to support a finding of probable cause.

The defendant concedes that the Commonwealth need disprove an affirmative defense only "where a defense appears clearly and without contradiction on the record." He simply fails to acknowledge that his is not such a case. The evidence of reasonable provocation here is not an objectively clear manifestation of such provocation or sudden combat, unlike the program membership card in *Commonwealth* v. *Landry, supra.*

[14]Requiring the Commonwealth to disprove claims of reasonable provocation and sudden combat logically would have to apply to any mitigating

elements of second-degree murder, the indictment survives the defendant's motion to dismiss insofar as it challenges the sufficiency of the evidence.

c. *Instruction to grand jury.* The defendant urges us to affirm the judge's ruling on an alternative ground that the indictment is invalid under *Commonwealth* v. *O'Dell*, 392 Mass. 445, 451 (1984), because the grand jury lacked legal instruction as to those circumstances raised by the evidence (reasonable provocation, sudden combat, and excessive use of force in self-defense) mitigating murder in the second degree to voluntary manslaughter. See *Commonwealth* v. *Levesque*, 436 Mass. 443, 455 (2002), quoting *Gabbidon* v. *King*, 414 Mass. 685, 686 (1993) ("on appeal [an appellate court] may consider any ground apparent on the record that supports the result reached in the lower court"). Had the grand jury been so instructed, he contends, and had they thereby been apprised of this alternative, they could have returned an indictment against this juvenile defendant for voluntary manslaughter rather than murder in the second degree. The former would proceed in the Juvenile Court, where this defendant would be afforded greater protections, while the latter indictment for murder requires him to be prosecuted in the Superior Court and treated as an adult in all respects.

As in every case, the Commonwealth has an obligation, which it fulfilled during the second presentment, to ensure that the integrity of the grand jury proceeding not be impaired by the withholding of significant mitigating or exculpatory evidence that would "probably influence[] the grand jury's determination to hand up an indictment." *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986). In past cases, for example, we have upheld dismissal of indictments where the Commonwealth presented a portion of a statement attributed to a defendant

circumstances raised by the evidence before the grand jury. See, e.g., *Commonwealth* v. *Grey*, 399 Mass. 469, 470 (1987) (mental condition); *Commonwealth* v. *Henson*, 394 Mass. 584, 592-593 (1985) (intoxication). This could "saddle a grand jury with minitrials and preliminary showings[, which] would assuredly impede its investigation and frustrate the public's interest in the fair and expeditious administration of the criminal laws." *United States* v. *Calandra*, 414 U.S. 338, 350 (1974), quoting *United States* v. *Dionisio*, 410 U.S. 1, 17 (1973). See *Commonwealth* v. *Robinson*, 373 Mass. 591, 593 (1977).

without revealing an exculpatory comment made in that same statement, *Commonwealth* v. *O'Dell, supra* at 448-449, where the Commonwealth knowingly offered false testimony to obtain the indictment, *Commonwealth* v. *Salman,* 387 Mass. 160, 166-167 (1982), and where the Commonwealth withheld evidence that would have greatly undermined the credibility of an important witness. *Commonwealth* v. *Mayfield, supra* at 620-621, citing *Commonwealth* v. *Connor,* 392 Mass. 838, 854 (1984). Requiring that such evidence be put before the grand jury assures that it can be considered by them in evaluating whether there is probable cause to return either the indictment sought or one for a lesser offense, or to return a no bill. Although we require the Commonwealth to bring such evidence before the grand jury, we have not generally required the Commonwealth to accompany that evidence with legal instructions, out of a concern that such a requirement "would add delay and complexity [to grand jury proceedings] without serving any significant purpose." *Commonwealth* v. *Noble,* 429 Mass. 44, 48 (1999).

Almost a century ago, we set out that "it is the duty of the district attorney in appropriate instances to advise [the grand jury] concerning the law." *Attorney Gen.* v. *Pelletier,* 240 Mass. 264, 307 (1922). Since that decision, we have only deemed one circumstance an "appropriate instance[]" for such instruction: when the grand jury, "being untrained in the law," *Commonwealth* v. *O'Dell, supra* at 449, themselves request legal instruction. See *Commonwealth* v. *Noble, supra* ("If the grand jurors had asked for instructions . . . the prosecutor should have provided the appropriate information"). Absent such a request, we have not heretofore required the prosecutor to offer legal instruction, as to either defenses, mitigating circumstances, or elements of the crime for which an indictment is sought.

While we have never required instruction without a request, we have also never been faced with the unique circumstances presented in this case, where the Commonwealth seeks a murder indictment against a juvenile, a class of defendants long given special consideration, despite significant evidence of mitigating circumstances that a grand jury reasonably may credit. The question before us is whether legal instructions should be provided to the grand jury where the return of a murder indict-

ment against the juvenile will deprive him of all protections typically accorded juveniles. Because of the different treatment of juveniles in the criminal justice system, recent changes in the system of juvenile justice that impact the work of the grand jury, and the importance of the interests at issue, I conclude that a "significant purpose" would be served by such legal instruction, *Commonwealth* v. *Noble, supra,* rendering this another such "appropriate instance[]" to require "the district attorney . . . to advise [the grand jury] concerning the law." *Attorney Gen.* v. *Pelletier, supra.*

"The extent of the [prosecutor]'s obligation to instruct the [g]rand [j]ury . . . must be defined with reference to the role of that body." *People* v. *Valles,* 62 N.Y.2d 36, 38 (1984). In our earliest case establishing the requirement, under art. 12 of the Massachusetts Declaration of Rights,[15] that certain criminal charges be preceded by a grand jury indictment, we described the protection that such a requirement affords:

> "The right of individual citizens to be secure from an open and public accusation of crime, and from the trouble, expense and anxiety of a public trial, before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty."

*Jones* v. *Robbins,* 8 Gray 329, 344 (1857) (requiring grand jury indictment for crimes punishable by term in State prison).

In the unique instance of juvenile defendants whom the prosecutor seeks to charge with murder, the grand jury not only serve as this shield against unfounded accusation, but in recent years have become the sole gatekeeper between the adult and juvenile justice systems. When a juvenile defendant is indicted

---

[15]In relevant part, art. 12 of the Massachusetts Declaration of Rights provides: "No subject shall be held to answer for any crimes or offence until the same is fully and plainly, substantially and formally, described to him . . . ." The Fifth Amendment to the United States Constitution imposes a similar obligation, but this right has not been incorporated against the States by the Fourteenth Amendment to the United States Constitution. See *Apprendi* v. *New Jersey,* 530 U.S. 466, 477 n.3 (2000).

for murder, he will be treated, in all respects, as an adult in the criminal justice system. He will be tried in the Superior Court.[16] He will receive none of the protections associated with a trial in the Juvenile Court, such as confidentiality and broad dispositional discretion. He will be subject to the same penalties as an adult charged with murder, which includes potential life imprisonment, and the sentencing judge will not be able to consider his status as a juvenile in imposing a sentence. As set out in detail below, in no other class of criminal cases is a juvenile treated, in all respects, as an adult.

The grand jury's role in the determination whether to treat juveniles as adults is a recent development. In 1996, the Legislature passed the youthful offender act (act), and thereby "made comprehensive changes in the Commonwealth's juvenile law in an effort to address growing concern about violent crimes committed by juveniles." *Doe* v. *Attorney Gen. (No. 1)*, 425 Mass. 210, 213 n.8 (1997). See St. 1996, c. 200. Prior to passage of the act, juveniles could be transferred to the Superior Court for prosecution and, if convicted, sentenced as adults for any crime only after a Juvenile Court judge conducted a two-part transfer hearing. See G. L. c. 119, § 61, as amended through St. 1993, c. 12, § 3; St. 1992, c. 398, § 3. The judge first determined whether there was probable cause that the juvenile committed the offense, and if so, the judge then considered the juvenile's dangerousness and amenability to rehabilitation.[17] See *Commonwealth* v. *Dale D.*, 431 Mass. 757, 758-759 (2000). By our own description, use of this statutory mechanism to effect transfer was warranted only in "exceptional circumstances." *A Juvenile* v. *Commonwealth*, 370 Mass. 272, 281-282 (1976). Thus, prior to the passage of the act, juveniles could not be tried as adults (even in murder cases) without a judge first considering their

---

[16]Not only will he be tried in the Superior Court, but also all pretrial proceedings will occur in the Superior Court. Indeed, every proceeding that has taken place thus far in the defendant's case — including arraignment, bail setting, and hearings on motions to dismiss — has been in the Superior Court.

[17]The Juvenile Court was required to hold transfer hearings at the Commonwealth's request, as well as in all cases where the alleged offense was murder, manslaughter, or certain other enumerated offenses. G. L. c. 119, § 61, as amended through St. 1993, c. 12, § 3. But regardless of the crime charged, the same two-part procedure was applicable if a transfer hearing was held. *Id.*

juvenile status. The decision accordingly did not rest with the grand jury, as it now does.

The act entirely eliminated this transfer procedure. See St. 1996, c. 200, § 7, repealing G. L. c. 119, § 61 (transfer hearing process). Today, as called for by the act, the criminal justice system treats juveniles in one of three ways: as a delinquent, a youthful offender, or an adult. "[I]f the juvenile is proceeded against by complaint, the juvenile is classified as a delinquent." *Commonwealth* v. *Dale D.*, *supra* at 759. If adjudicated delinquent on the complaint, the child may be committed to the Department of Youth Services until he reaches the age of eighteen (or nineteen, if the case is not disposed of until after he has reached the age of eighteen). G. L. c. 119, § 58.[18] However, "[i]f an indictment is successfully obtained, the juvenile is classified as a youthful offender."[19] *Commonwealth* v. *Dale D.*, *supra* at 759. A youthful offender faces the possibility of greater penalties than a juvenile tried as a delinquent, including the sentence that would be applicable to an adult tried for the same crime.[20] This distinction, between delinquency and youthful

---

[18]Such commitment is subject to possible extension if the Department of Youth Services is "of the opinion that discharge of a person from its control . . . would be physically dangerous to the public." G. L. c. 120, § 17.

[19]To obtain a youthful offender indictment, the Commonwealth must present sufficient evidence before the grand jury that "(1) the alleged offense was committed while the individual was between the ages of fourteen and seventeen years; (2) if he were an adult, the offense would be punishable by imprisonment in the State prison (i.e., a felony); and (3) the individual was previously committed to the department of youth services, *or* the alleged offense involved certain enumerated firearms violations, or it involved 'the infliction or threat of serious bodily harm.'" *Commonwealth* v. *Quincy Q.*, 434 Mass. 859, 862-863 (2001), quoting G. L. c. 119, § 54. If the grand jury returns a no bill, however, the Commonwealth retains its ability to proceed by complaint against the juvenile. *Commonwealth* v. *Dale D.*, *supra* at 760-761.

[20]Such an adult sentence need not be imposed, however. The judge has discretion either to sentence the youthful offender as provided by law, to impose a combination sentence committing the offender to the Department of Youth Services until age twenty-one followed by an adult sentence in State prison, or to impose only commitment to the Department of Youth Services until age twenty-one. G. L. c. 119, § 58. In making this sentencing determination, the judge is to consider, among other things, "the nature of services available through the juvenile justice system; the youthful offender's age and maturity; and the likelihood of avoiding future criminal conduct." *Id.* If sentenced to State prison, the juvenile must be held in a youthful offender unit separate from the general population of adult prisoners until his seventeenth birthday. *Id.*

offender status, "affects only sentencing," *id.* at 761; either way, "the case is tried in the Juvenile Court." *Id.* at 759.

If a juvenile is charged with murder, however, both of these options (delinquent and youthful offender status) are off the table. Unlike all other crimes, juveniles indicted for murder in any degree *must* be treated as adults in all respects. "The juvenile court shall not have jurisdiction over a person who had at the time of the offense attained the age of fourteen but not yet attained the age of seventeen who is charged with committing murder in the first or second degree." G. L. c. 119, § 74. By so limiting the jurisdiction of the Juvenile Court, the act required that a juvenile indicted for murder be tried "in accordance with the usual course and manner of criminal proceedings" applicable to adult defendants in the Superior Court. *Id.*

The grand jury's decision here, indicting the defendant for murder, in effect transferred his case from the Juvenile to the Superior Court, something that could not have occurred absent a murder indictment. Had the grand jury indicted him for voluntary manslaughter rather than murder in the second degree, all subsequent proceedings would have taken place in the Juvenile Court. The grand jury returned the murder indictment that the Commonwealth sought without the defendant's status as a juvenile having been factored into the process in any manner.

The differences between being tried in the Superior Court and in the Juvenile Court are considerable. In the Juvenile Court, on the basis of "our legal system's traditional policy which affords minors a unique and protected status," *Commonwealth* v. *A Juvenile*, 389 Mass. 128, 132 (1983), "the care, custody and discipline of the children brought before the court shall approximate that which they should receive from their parents, and . . . , as far as practicable, they shall be treated, not as criminals, but as children in need of aid, encouragement and guidance." G. L. c. 119, § 53. In other words, "[t]his is not a punitive scheme strictly akin to the adult criminal justice system. Rather, it is primarily rehabilitative, cognizant of the inherent differences between juvenile and adult offenders, and geared toward 'the correction and redemption to society of delinquent children.' " *Commonwealth* v. *Magnus M.*, 461 Mass. 459, 461 (2012), quoting *Metcalf* v. *Commonwealth*, 338 Mass.

648, 651 (1959). As a consequence, proceedings against children "shall not be deemed criminal proceedings."[21] G. L. c. 119, § 53.

Justice Spina hinges much of his discussion on the application of the act. *Post* at 851-852, 855-856 (Spina, J., concurring in part and dissenting in part). The act, however, did not merge the juvenile and criminal justice systems.

> "[T]he provisions of the 1996 amendments did not eviscerate the longstanding principle that the treatment of children who offend our laws are not criminal proceedings. See, e.g., *Department of Youth Servs.* v. *A Juvenile*, 384 Mass. 784, 786 (1981), and cases cited. Notably, the 1996 act did not amend G. L. c. 119, § 53, which declares the legislative policy that the operative provisions of the statutes shall be liberally construed to require rehabilitative 'aid, encouragement and guidance' rather than criminal dispositions for children who offend. Moreover, even as to the category of children adjudicated 'youthful offenders,' the statute does not label a 'youthful offender' proceeding as criminal. The distinction our law recognizes between child and adult adjudication exists partly to avoid the infringement of a child's constitutional rights, and partly to avoid the attachment of criminal stigma to children who may be amenable to rehabilitation. *Metcalf* v. *Commonwealth*, 338 Mass. 648, 651 (1959). The 1996 amendments did not alter that fundamental policy determination by the Legislature."

*Commonwealth* v. *Connor C.*, 432 Mass. 635, 641-642 (2000). Despite Justice Spina's efforts to minimize the seemingly self-

---

[21]The differences between juvenile delinquency and criminal proceedings play out in numerous respects. To preserve the confidentiality of those charged in Juvenile Court, delinquency proceedings are not accessible to the public. G. L. c. 119, § 65. Records of juvenile delinquency cases are similarly closed to the public. G. L. c. 119, § 60A. Because of this confidentiality, the child is shielded from much of the stigma and collateral consequences that follow from an adult conviction. Although these confidentiality protections are not afforded to those charged as youthful offenders, their absence does not eviscerate the meaningful distinction between those charged as adults and those charged as youthful offenders. In any event, the Commonwealth may proceed against the defendant as a delinquent if it fails to obtain a youthful offender indictment. See *Commonwealth* v. *Dale D.*, *supra* at 761.

evident differences between being tried as a youthful offender in the Juvenile Court and being tried as an adult in the Superior Court, our case law is to the contrary. Indeed, were there no difference, the Legislature simply would have allowed juveniles charged with murder to be tried as youthful offenders.

Juveniles tried as adults and convicted of murder must also be sentenced as adults. See G. L. c. 119, § 72B. Sentencing judges have no discretion to consider the defendant's status as a juvenile. By statute, a juvenile convicted of murder in the first degree must receive a mandatory sentence of life without parole.[22] G. L. c. 265, § 2. A juvenile convicted of murder in the second degree (with which the defendant here is charged) also receives a sentence of life imprisonment but has the possibility of parole after fifteen years of confinement. See *id.*; G. L. c. 119, § 72B. Juveniles tried as adults and convicted of murder are, without exception, sentenced as adults.

If tried as a youthful offender for voluntary manslaughter, however, the sentencing judge (in the Juvenile Court) would have considerable discretion to consider the defendant's juvenile status and select from a wide range of possible sentences.[23] Even if the judge decided to sentence the defendant "as is provided by law for the offense," G. L. c. 119, § 58, the maximum possible sentence would be twenty years in State prison. G. L. c. 265, § 13. But the judge would have broad discretion to impose a considerably lesser sentence, including commitment to the Department of Youth Services until the defendant reaches the age of twenty-one.[24] While juveniles tried

---

[22]But see *Miller* v. *Alabama*, 132 S. Ct. 2455, 2469 (2012).

[23]If tried as a delinquent, the defendant could only be subject to commitment until his eighteenth or nineteenth birthday (depending on when the adjudication was completed), G. L. c. 119, § 58, subject to possible extension by the Department of Youth Services. See G. L. c. 120, § 17.

[24]Of course, a juvenile can be sentenced as a youthful offender if tried for murder in the Superior Court but only convicted of a lesser offense. G. L. c. 119, § 72B. While the statute gives Superior Court judges this power to sentence the juvenile as youthful offenders, we have recognized that a Juvenile Court judge's particular "expertise in weighing social and psychological factors . . . come[s] into play where it counts — the dispositional phase." *Commonwealth* v. *Magnus M.*, 461 Mass. 459, 467 (2012), quoting *In re Javier A.*, 159 Cal. App. 3d 913, 971 n.57 (1984).

as youthful offenders are subject to possible adult sentences, the sentencing judge, unlike in murder cases, takes the defendant's status as a juvenile into account when deciding whether to impose such a sentence.

Justice Spina asserts that I offer "no meaningful insight or guidance," *post* at 852, as to how the grand jury are to take the defendant's status as a juvenile into account when deciding the indictment to return. The instructions I suggest be given, however, include an instruction informing the grand jury that a murder indictment will result in the juvenile being tried in the Superior Court, see note 33, *infra*. This allows the grand jury to consider the defendant's status as a juvenile and, if their view of the evidence permits it, to return an indictment that would preserve the protections afforded by a trial in the Juvenile Court. What Justice Spina characterizes, *post* at 851, as "advocating" a new gatekeeper role for the grand jury is in fact merely a recognition of the added role of gatekeeper that the Legislature has already chosen to impose on the grand jury in these situations.

In recognition of the reduced culpability of minors as compared to adults, the United States Supreme Court has in recent decisions declared the harshest of penalties unconstitutional as applied to juvenile defendants. First, in *Roper* v. *Simmons*, 543 U.S. 551, 564, 569 (2005) (*Roper*), the United States Supreme Court, in light of a "national consensus against the death penalty for juveniles" and the "general differences between juveniles under 18 and adults," ruled that the juvenile death penalty is contrary to the prohibition on cruel and unusual punishment in the Eighth Amendment to the United States Constitution. Next, in *Graham* v. *Florida*, 130 S. Ct. 2011, 2026 (2010) (*Graham*), the Court held that juveniles could not constitutionally be sentenced to life without parole for non-homicide crimes because, due to their lessened culpability, "they are less deserving of the most severe punishments." Finally, just this year in *Miller* v. *Alabama*, 132 S. Ct. 2455, 2469 (2012) (*Miller*), the Court concluded that the imposition of mandatory life without parole on a juvenile (as required for a conviction of murder in the first degree) similarly violates the Eighth Amendment. That decision

reaffirmed the "diminished culpability and greater prospects for reform" of juveniles.[25] *Id.* at 2464.

Because grand jury indictment of a juvenile for murder pursuant to G. L. c. 119, § 74, results in the treatment of the juvenile defendant as an adult for all purposes, it evokes many of the same concerns as the sentencing at issue in *Roper*, *Graham*, and *Miller*: it ignores the fact that "the two classes differ significantly in moral culpability and capacity for change."[26] *Miller*, *supra* at 2464 n.7.

While not eliminating the possibility that juveniles can in some instances be treated the same as adults, the animating purpose of these cases appears to be an effort to foreclose "criminal procedure laws that fail to take defendants' youthfulness into account at all." *Graham*, *supra* at 2031.[27] In this case, at no point in the indictment decision was the defendant's youth taken into account.[28] Unlike transfer practice prior to passage of

---

[25]Our own juvenile justice system is premised on similar considerations. See R.L. Ireland, Juvenile Law § 1.3, at 18 (2d ed. 2006) ("The rationale of [the dual system for adult and juvenile offenders] is diminished culpability: deviant behavior of children may be regarded as generally less culpable than similar adult behavior for the reason that a child's capacity to be culpable . . . is not as fixed or as absolute as that of an adult").

[26]The United States Supreme Court, in *Roper* v. *Simmons*, 543 U.S. 551, 569-570 (2005), identified three differences between juveniles and adults in striking down the juvenile death penalty: juveniles lack maturity and a sense of responsibility; juveniles are more susceptible to negative influences and outside pressures; and the character of a juvenile is more transitory than that of an adult.

[27]Justice Spina rests, in considerable part, on the view that this line of decisions does not compel the result reached here. *Post* at 852-853. Of course, I have not suggested otherwise. There is, however, no reason to think that the factors taken into account by the United States Supreme Court — a juvenile's reduced culpability and greater amenability to rehabilitation — are without force when considering whether it is appropriate for the grand jury to receive legal instruction before rendering a decision to indict a juvenile for murder.

Moreover, given the vast majority of criminal convictions that are reached by plea bargaining, see note 31, *infra*, the nature of the indictment returned has an increasingly direct impact on sentencing. An indictment for murder rather than manslaughter necessarily affects the nature of a plea agreement and the sentence imposed.

[28]The defendant's youthfulness may have been taken into consideration by the prosecutor in the charging decision, but that was also the case with respect to the sentencing requested by the prosecutors in *Roper*, *Graham*, and *Miller*. The sentences in those cases were still stricken as unconstitutional. After the

the act, the Commonwealth's decision to seek an indictment for murder (and the grand jury's decision to return one) bypassed the Juvenile Court and any attendant protections for this defendant. The murder indictment, not unlike the mandatory sentence held unconstitutional in *Miller, supra* at 2466, results in the identical treatment of juveniles and adults without any consideration of the defendant's status as a juvenile, and thus "remov[es] youth from the balance."

Because juveniles charged with murder are uniquely treated as adults for all purposes by virtue of the grand jury's decision to indict, it is prudent to afford them some additional protection when this decision is made, i.e., during the presentment to the grand jury. The grand jury need not indict a juvenile for murder simply because the prosecutor seeks an indictment for that crime; depending on their assessment of the evidence, they may indict for a lesser offense or may even return a no bill. This power to indict for a lesser offense, which the grand jury have long enjoyed, see *Vasquez* v. *Hillery*, 474 U.S. 254, 263 (1986), and the utility of legal instruction in enabling them to exercise it in appropriate circumstances, takes on special significance in cases such as this one. In such instances, the grand jury not only determine whether the defendant will be charged with a particular crime, they also decide whether the juvenile will be treated for all purposes as an adult. They should have suitable tools for their enhanced task.

In light of the significant interests that would be served, I conclude that a presentment in which the Commonwealth seeks to indict a juvenile for murder constitutes an "appropriate instance[]" in which legal instructions to a grand jury are

youthful offender act (act), see St. 1996, c. 200, eliminated the transfer hearing altogether, "[t]he initial decision on how to treat an alleged juvenile offender [was] taken away from the judge, a neutral and detached arbitrator, and put in the hands of the [district] attorney, an advocate for the [S]tate and adversary of the juvenile." Comment, "Waiving" Goodbye to Juvenile Defendants, Getting Smart vs. Getting Tough, 49 U. Miami L. Rev. 431, 450-451 (1994). "[P]rosecutors make charging decisions in private and have no obligation to provide any rationale for such decisions." Davis, The American Prosecutor: Independence, Power, and the Threat of Tyranny, 86 Iowa L. Rev. 393, 435 (2001). Given this, and the fact that the decision to indict rests with the grand jury, it is appropriate to factor more than prosecutorial discretion alone into the process.

required. *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 307 (1922). In these limited circumstances, the grand jury must be instructed as to the elements of the degree of murder for which an indictment is sought, as well as any defenses or mitigating circumstances that are raised by the evidence.[29] Because this case is fully resolved by reference only to cases in which a juvenile is charged with murder, I do not address the merits of Justice Gants's proposal, which would apply in all murder cases. *Post* at 837 (Gants, J., concurring).

This instructional requirement imposes scant burden on the Commonwealth. It can fairly be said that the prosecutor holds all the cards before the grand jury.[30] If the Commonwealth cannot obtain a murder indictment after using the model jury instructions on homicide, as appropriately modified, see *infra*, to explain the relevant law to the grand jury, it is implausible that it will be able to meet its burden of proof at trial, where the petit jury will have received more detailed legal instruction, its witnesses will be subject to cross-examination, the defense may call its own witnesses, and the rules of evidence will apply.[31]

---

[29]The Commonwealth does not, however, have to provide legal guidance regarding a suspect's lack of criminal responsibility, since the prosecutor in a grand jury proceeding is unable to obtain a court order that a suspect submit to a psychiatric examination by a Commonwealth expert regarding his mental condition. See Mass. R. Crim. P. 14 (b) (2) (B), as appearing in 442 Mass. 1518 (2004); *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 765-766 (1977).

[30]The grand jury, unlike the petit jury, generally hear only inculpatory evidence introduced by the Commonwealth, see *Commonwealth* v. *Wilcox*, 437 Mass. 33, 37 (2002), without witnesses being subject to cross-examination, the admission of evidence subject to the rules of either evidence or exclusion, or the proceedings constrained by the presence of a judge. See *Commonwealth* v. *Gibson*, 368 Mass. 518, 522-525 (1975). While the verdict of a petit jury must be unanimous, a grand jury may return an indictment by a vote of a majority of their entire membership, see *Brunson* v. *Commonwealth*, 369 Mass. 106, 120 (1975); grand jury proceedings are both secret and ex parte, see *WBZ-TV4* v. *District Attorney for the Suffolk Dist.*, 408 Mass. 595, 599-600 (1990), quoting *Commonwealth* v. *St. Pierre*, 377 Mass. 659, 656 n.6 (1979); "an indictment may be based solely on hearsay," *Commonwealth* v. *O'Dell*, 392 Mass. 445, 450-451 (1984); and the standard of proof before the grand jury is considerably lower than that applicable at trial. See *Commonwealth* v. *Riley*, 73 Mass. App. Ct. 721, 726-727 (2009).

[31]All this being said, however, the utility of any comparison of the grand and petit juries must be seen in context. Although the Commonwealth must obtain an indictment to try a juvenile as an adult (or as a youthful offender) in

Nor does the requirement of legal instruction in any way alter or expand the role of the grand jury. It does not change the Commonwealth's obligation to present evidence or to meet the legal standard of probable cause before the grand jury. Contrary to Justice Spina's view, *post* at 850, it does not require the Commonwealth to present evidence to disprove any evidence of a defense or of mitigating circumstances. As explained in the first part of this concurring opinion, the Commonwealth bears no burden to disprove mitigating circumstances or defenses before the grand jury. As ever, the grand jury remain free, after assessing the evidence, to return the indictment requested by the Commonwealth, indict for a lesser offense, or return a no bill. All that is required now is that the Commonwealth provide a measure of legal instruction in what I regard as being an additional "appropriate instance[]," *Attorney Gen.* v. *Pelletier, supra* — when it seeks to indict a juvenile for murder.

That a juvenile defendant may be afforded a fair trial in the Superior Court after the murder indictment does not obviate the concerns giving rise to this requirement. "The question concerning a juvenile who is certified through a grand jury to adult court is not whether he will get a fair trial (as incredibly important as that is), but whether he should be retained by the adult system . . . ." Brummel, Doing Adult Time for Juvenile Crime: When the Charge, Not the Conviction, Spells Prison for Kids, 16 Law & Ineq. J. 541, 554 n.85 (1998). The indictment decision determines whether the juvenile will be tried in Juvenile Court, thus "mark[ing] not only the beginning but also the end of adjudication as to the child's suitability for juvenile treatment." *United States* v. *Bland,* 472 F.2d. 1329, 1348 (D.C. Cir. 1972) (Wright, J., dissenting). Even if the juvenile is tried fairly in the Superior Court, he or she has still lost the opportunity to be

---

all cases, the vast majority of cases rarely reach a petit jury. *Lafler* v. *Cooper,* 132 S. Ct. 1376, 1388 (2012), quoting *Missouri* v. *Frye,* 132 S. Ct. 1399, 1407 (2012) ("Ninety-seven percent of federal convictions and ninety-four percent of state convictions are the result of guilty pleas"). Thus, while I agree that the petit jury may certainly be better equipped to differentiate between levels of offenses, "it is insufficient simply to point to the guarantee of a fair trial as a backstop that inoculates any errors in the pretrial process." *Missouri* v. *Frye, supra.*

tried as a delinquent or youthful offender in the Juvenile Court.[32] Justice Spina suggests, relying on authority from another State, that instruction need only be given to the grand jury where the evidence, if believed, would "result in a finding of *no* criminal liability." *Post* at 849. This is hardly sufficient, since evidence of mitigating circumstances and incomplete defenses such as reasonable provocation or sudden combat does not result in "complete exoneration." *Id.* It is precisely because such evidence can, as here, support indictments other than murder that legal instructions may make a difference and be worthwhile when a murder indictment is sought against a juvenile.

Although legal instructions must be provided in these circumstances, I note that a grand jury "need not be instructed with the same degree of precision that is required when a petit jury is instructed on the law." *People* v. *Calbud, Inc.*, 49 N.Y.2d 389, 394 (1980). As a result, use of the Model Jury Instructions on Homicide, modified as appropriate for use before the grand jury, to define the elements of the crime charged and set out the legal requirements of defenses or mitigating circumstances raised by the evidence will ordinarily be sufficient for the Commonwealth to discharge its obligation to provide instructions.[33] But in giving instructions, either requested or required under this rule, the prosecutor "may not express his own opinion, make arguments, or state facts which are not relevant to the guilt or innocence of the person under inquiry." *Commonwealth* v. *Kelcourse*, 404 Mass. 466, 468 (1989), citing *Attorney Gen.* v. *Pelletier, supra* at 307-308. Prosecutors also may not intentionally " 'distort the meaning' of the [law] that they present by withholding certain portions of it." *Commonwealth* v. *Arroyo*, 442 Mass. 135, 143 (2004), quoting *Commonwealth* v. *O'Dell*, 392 Mass. 445, 449 (1984). "Before the grand jury the prosecu-

---

[32] I also recognize that, to a large degree, plea bargaining has supplanted the jury trial as the primary source of criminal convictions. "[C]riminal justice today is for the most part a system of pleas, not a system of trials." *Lafler* v. *Cooper, supra.*

[33] The grand jury should also be instructed that their decision to indict the juvenile for murder, in whatever degree for which an indictment is sought, will result in the juvenile's being tried in the Superior Court "in accordance with the usual course and manner of criminal proceedings." G. L. c. 119, § 74.

tor has the dual role of pressing for an indictment and of being the grand jury's adviser. In case of conflict, the latter duty must take precedence." *United States* v. *Ciambrone*, 601 F.2d 616, 628 (2d Cir. 1979) (Friendly, J., dissenting).

During the second presentment, in which the Commonwealth sought (and obtained) an indictment for murder in the second degree, the record[34] reflects that the grand jury did not request and were not given any legal instructions. For the reasons stated, I find the absence of such instructions to be fatal to the indictment.


GANTS, J. (concurring, with whom Botsford and Duffly, JJ., join). The grand jury in this case heard substantial evidence that the then sixteen year old defendant stabbed the victim during a fistfight immediately after the victim and his friend told the defendant, who was alone, that they were going to steal his marijuana and then assaulted him to accomplish the theft. I agree with the court that, viewing the evidence in the light most favorable to the prosecution, the evidence was sufficient to support a finding of probable cause that the defendant committed murder in the second degree. But the grand jurors were not obligated to view the evidence in the light most favorable to the prosecution; they were entitled to conclude, based on all of the evidence presented by the prosecutor, that the defendant committed the killing in the heat of passion on reasonable provocation or induced by sudden combat and that there was not probable cause to find the defendant committed murder. Yet, the prosecutor did not inform the grand jury that malice is a required element of murder in the second degree, and that a killing committed in the heat of passion on reasonable provocation or induced by sudden combat is committed without malice. Nor did the prosecutor inform the grand jury of the lesser crime of voluntary manslaughter. Instead, the grand jury, apparently unaware of the legal significance of the circumstances of the killing (and of the

---

[34]The court reporter should record not only the testimony of the witnesses, but also the legal instruction provided by the prosecutor during the presentment (as well as any additional requested instructions), so as to ensure that adequate judicial review of the proceedings is possible. See *Commonwealth* v. *Carpenter*, 22 Mass. App. Ct. 911, 912 (1986) (prosecutor should not go "off the record" during presentment to grand jury).

possibility of returning an indictment charging voluntary manslaughter), returned the indictment requested by the prosecutor — murder in the second degree.

I conclude that where, as here, the prosecutor seeks an indictment for murder despite evidence of mitigating circumstances that is so substantial that concealing it would impair the integrity of the grand jury, the prosecutor is required to give the grand jury legal instruction on the elements of murder in the second degree and on the legal significance of the mitigating circumstances. And I believe such instruction is required in these circumstances regardless of whether the person accused is a juvenile or an adult.

Under art. 12 of the Massachusetts Declaration of Rights and G. L. c. 263, § 4, a defendant may not be indicted for a felony unless a grand jury, based on sufficient evidence, find probable cause to believe that the defendant committed the crime charged.[1] See *Commonwealth* v. *Moran,* 453 Mass. 880, 884-887 (2009); *Lataille* v. *District Court of E. Hampden,* 366 Mass. 525, 531-532 (1974); *DeGolyer* v. *Commonwealth,* 314 Mass. 626, 632-633 (1943); *Commonwealth* v. *Harris,* 231 Mass. 584, 585 (1919). We have long recognized:

> "The right of individual citizens to be secure from an open and public accusation of crime, and from the trouble, expense and anxiety of a public trial, before a probable cause is established by the presentment and indictment of a grand jury, in case of high offences, is justly regarded as one of the securities to the innocent against hasty, malicious and oppressive public prosecutions, and as one of the ancient immunities and privileges of English liberty."

*Jones* v. *Robbins,* 8 Gray 329, 344 (1857). See generally 4 W.R. LaFave, J.H. Israel, N.J. King, & O.S. Kerr, Criminal Procedure

---

[1] A defendant in Federal court has the right under the Fifth Amendment to the United States Constitution not to be tried for a felony without first being indicted by a grand jury, but this is one of the few rights in the Bill of Rights that is not incorporated into the Fourteenth Amendment to the United States Constitution and therefore does not apply to State crimes. See *Apprendi* v. *New Jersey,* 530 U.S. 466, 477 n.3 (2000). Therefore, I focus solely on the defendant's rights under art. 12 of the Massachusetts Declaration of Rights and G. L. c. 263, § 4.

§ 15.1(a), at 379 (3d ed. 2007) (LaFave) ("shielding role" of grand jury revered in American colonies). And we also have recognized that "[a] grand jury finding of probable cause is necessary if indictments are to fulfil their traditional function as an effective protection 'against unfounded criminal prosecutions.' " *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982), quoting *Lataille* v. *District Court of E. Hampden, supra* at 532.

A grand jury may not indict an individual for an offense unless evidence is presented as to each of its elements. See *Commonwealth* v. *Moran, supra* at 884 ("The grand jury must be presented with evidence on each of the three elements . . ."). The elements of murder in the second degree are (1) an unlawful killing and (2) malice, which may be satisfied by evidence of any of the three prongs of malice. See *Commonwealth* v. *Earle*, 458 Mass. 341, 346 (2010), citing Model Jury Instructions on Homicide 20 (1999).

As to the first element, there is little question that there was an unlawful killing in this case. *Ante* at 817-822 (Lenk, J., concurring). As to the second element, a killing is not committed with malice if committed in the heat of passion on reasonable provocation or induced by sudden combat.[2] See Model Jury Instructions on Homicide, *supra* at 29-30 ("If the Commonwealth has not proved beyond a reasonable doubt the absence of heat of passion upon reasonable provocation [or the absence of heat of passion induced by sudden combat], the Commonwealth has not proved malice"). See also *Commonwealth* v. *Whitman*, 430 Mass. 746, 751-752 (2000), and cases cited ("In a murder case where evidence has raised the possibility of provocation and voluntary manslaughter may be at issue, proof of malice requires proof of the absence of provocation"). Cf. *Commonwealth* v. *Moran, supra*, and cases cited ("The crime of armed assault with intent to murder has three elements: assault; intent to kill; and malice, which in this context means an absence of justification, excuse, or mitigation"). Therefore, where a grand jury conclude that the defendant probably killed in the heat of passion on reasonable

---

[2]A killing is also not committed with malice if excessive force is used in self-defense. Model Jury Instructions on Homicide 30 (1999). I focus on reasonable provocation and sudden combat here, because I believe those are the more compelling mitigating circumstances in this case.

provocation or induced by sudden combat, and reject the evidence that the defendant probably acted with malice, a grand jury would find no probable cause to believe that the defendant committed murder and should either return a no bill or be given the option of returning an indictment for voluntary manslaughter. Cf. *Commonwealth* v. *Acevedo*, 427 Mass. 714, 716 (1998) (where evidence at trial raises possibility that defendant acted on reasonable provocation, in sudden combat, or in self-defense, constitutional due process requires that Commonwealth must prove [and jury must find] absence of mitigating factor beyond reasonable doubt for murder conviction).

Where evidence of mitigating circumstances is withheld from a grand jury for the purpose of obtaining an indictment and where the withholding of such evidence probably influenced the grand jury's decision to indict, the integrity of the grand jury proceeding is compromised and dismissal without prejudice is required. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986). A grand jury are entitled to hear such evidence where it is substantial and may be important to their decision whether to indict for murder or voluntary manslaughter. See *id.*

Evidence of mitigating circumstances, however, is meaningless to a grand jury that have not been provided with the guidance necessary to understand its legal significance. It makes no sense to require a prosecutor to provide the grand jury with evidence of reasonable provocation and sudden combat in a case such as this, where there is strong evidence of both reasonable provocation and sudden combat, but not also to require a prosecutor to instruct the grand jury that malice is an element of murder in the second degree, and that reasonable provocation and sudden combat negate malice, so that grand jurors know of the relevance of such evidence in deciding whether to indict the defendant for murder or voluntary manslaughter.

It also makes no sense for a prosecutor to owe a duty to provide such a legal instruction only where the grand jury know enough about the law of homicide to ask for such an instruction. The law of homicide is too complex reasonably to expect a grand jury to know the legal significance of reasonable provocation or sudden combat without instruction by a prosecutor, or even to recognize that it may be an issue for which they should

seek legal guidance. In contrast with indictments for some other crimes, an indictment charging murder does not even list the elements of the crime, alleging only that the defendant "did assault and beat" the victim "with intent to murder him . . . and by such assault and beating did . . . murder" the victim. G. L. c. 277, § 79. Therefore, reading the proposed murder indictment would not alert a reasonable juror to the legal significance of a defendant committing the killing in a heat of passion arising from reasonable provocation or sudden combat. Contrast *Hamling* v. *United States*, 418 U.S. 87, 117 (1974) ("an indictment is sufficient if it, first, contains the elements of the offense charged"); *United States* v. *Superior Growers Supply, Inc.*, 982 F.2d 173, 176 (6th Cir. 1992) ("indictment will usually be sufficient if it states the offense using the words of the statute itself, as long as the statute fully and unambiguously states all the elements of the offense").

Under our holding in *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 307 (1922), a prosecutor owes a duty to instruct a grand jury as to the law "in appropriate instances." This duty is consistent with our recognition that "[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate," including the responsibility "to see that the defendant is accorded procedural justice." Comment [1] to Mass. R. Prof. C. 3.8, as amended, 428 Mass. 1305 (1999). It is also consistent with the United States Department of Justice's understanding of the role of a prosecutor in a Federal grand jury: "The prosecutor's responsibility is to advise the grand jury on the law and to present evidence for its consideration." United States Department of Justice, United States Attorneys' Manual § 9-11.010 (1997). See N.Y. Crim. Proc. § 190.25(6) (McKinney 2007) ("The legal advisors of the grand jury are the court and the district attorney, and the grand jury may not seek or receive legal advice from any other source. Where necessary or appropriate, the court or the district attorney, or both, must instruct the grand jury concerning the law with respect to its duties or any matter before it, and such instructions must be recorded in the minutes"). See also *State* v. *Edmonson*, 113 Idaho 230, 238 (1987) ("prosecutor is expected to act as the grand jury's legal advisor"). See generally LaFave, *supra* at

§ 15.2(e), at 476 ("The prosecutor serves not only as the state's advocate in presenting its case to the grand jury, but also as the primary legal advisor to the grand jury").

I do not believe that a prosecutor should only provide this legal instruction where the grand jury know enough about the law of homicide to ask for such an instruction or where the defendant is a juvenile facing a possible murder indictment. I believe that where, as here, it would impair the integrity of the grand jury if evidence were withheld regarding the circumstances suggesting that the defendant killed in a heat of passion arising from reasonable provocation or sudden combat, it equally impairs the integrity of the grand jury if *legal instructions* are withheld that would enable them to understand the legal significance of such evidence.

The requirement that the prosecutor provide such legal instruction would not change the role of the grand jury or put any additional burden on them. The grand jury would still be charged with determining whether the prosecutor provided credible evidence establishing probable cause to believe the crime in question was committed. The grand jury may even be instructed that the prosecution is entitled to an indictment of the crime charged if it is supported by probable cause based on the credible evidence.[3] The grand jury would remain free to find that the reliable evidence of mitigating circumstances is too weak to defeat probable cause and, therefore, return the indictment

---

[3]Despite what Justice Spina claims, I agree that, where the Commonwealth has presented *credible* evidence to support an accusation of murder in the second degree, a grand jury are not "entitled simply to choose between murder and manslaughter," and an indictment should issue for the highest crime supported by probable cause to arrest. *Post* at 847 (Spina, J., concurring in part and dissenting in part). I differ with Justice Spina in that I recognize the possibility that the grand jury may reject as unreliable the Commonwealth's evidence of malice, but accept as more trustworthy the evidence of mitigating circumstances. In contrast to a reviewing court's evaluation of the sufficiency of the evidence, which views the evidence in the light most favorable to the prosecution, a grand jury need not view the evidence in so favorable a light in deciding probable cause. Where there is substantial evidence of mitigating circumstances, that may mean that the evidence of probable cause is legally sufficient to support an indictment for murder, but that a grand jury may conclude that the *credible* evidence is insufficient to support a finding of probable cause as to the element of malice. Where they so find, the highest crime supported by probable cause is voluntary manslaughter, not murder.

sought. But where the grand jury find that the credible evidence of mitigating circumstances is substantial, and that there is not credible evidence to support a finding of malice, the grand jury should understand that the legal consequence of these findings is that there is probable cause to believe that the defendant committed voluntary manslaughter, not murder in the second degree.

I would limit the "appropriate instances" where such a duty may arise to grand juries considering indictments for murder where the evidence of a legal defense (other than lack of criminal responsibility[4]) or mitigating circumstances is so strong that, if such evidence were withheld, the integrity of the grand jury would be impaired. Cf. *State* v. *Grose*, 387 N.W.2d 182, 189 (Minn. Ct. App. 1986) ("The grand jury should have been properly instructed as to the statute of limitations defense"); *State* v. *Hogan*, 336 N.J. Super. 319, 340-343 (App. Div.), cert. denied, 167 N.J. 635 (2001) (prosecutor owes duty to instruct grand jury on possible defenses "only when the facts known to the prosecutor clearly indicate or clearly establish the appropriateness of an instruction"); *People* v. *Valles*, 62 N.Y.2d 36, 38-39 (1984) (prosecutor must instruct grand jury on "exculpatory," but not "mitigating," defense); *id.* at 39-41 (Kaye, J., concurring) (prosecutor should also instruct grand jury on mitigating defense where evidence of defense is "clear and pervasive").[5]

These "appropriate instances" do not arise often but, when

[4]I recognize that this analysis would not apply where the evidence raises an issue of criminal responsibility, because the prosecutor in a grand jury proceeding is unable to obtain a court order that a suspect submit to a psychiatric examination by a Commonwealth expert regarding his mental condition. See Mass. R. Crim. P. 14 (b) (2), as appearing in 442 Mass. 1518 (2004); *Blaisdell* v. *Commonwealth*, 372 Mass. 753, 765-766 (1977). I do not suggest that the Commonwealth is obligated to present the grand jury with evidence that the defendant lacks criminal responsibility or give legal guidance regarding criminal responsibility.

[5]Justice Spina claims that providing legal instruction regarding the circumstances that may mitigate murder to voluntary manslaughter will make the grand jury proceedings "more like a preliminary trial in its complexity." *Post* at 848. A prosecutor's duty to provide a grand jury with these legal instructions, however, arises only where the evidence of mitigating circumstances is so strong that we require that it be presented to the grand jury to preserve the integrity of the grand jury. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 621 (1986). In such cases, there is inherently a degree of

they do, they present a substantial due process issue as to the validity of a murder indictment and warrant the court's attention.[6] Limiting the "appropriate instances" to murder indictments also means that a prosecutor will have the benefit of our model homicide instructions in instructing the grand jury, which will need to be adapted to reflect the different standard of proof (probable cause) applied by a grand jury, but once adapted will diminish the risk of an erroneous instruction. The legal instructions need not be as precise as we require where a petit jury are instructed by a trial judge as to the law. See *People* v. *Darby*, 75 N.Y.2d 449, 454 (1990). See also *State* v. *Hogan, supra* at 344 (prosecutor's duty is met "as long as the instruction conveys to the grand jury the gist of the exonerating defense or justification . . .").

This is one of those rare cases where the evidence of reasonable provocation and sudden combat is so strong that the integrity of the grand jury was impaired by the absence of any legal instruction regarding the definition of heat of passion arising from reasonable provocation or sudden combat, the negation of malice where heat of passion is aroused by reasonable provocation or sudden combat, and the alternative of returning an indictment charging voluntary manslaughter if the grand jury were to find that the Commonwealth failed to establish probable cause of malice because the killing was committed in the heat of passion. Without this legal guidance, it is likely that the evidence of reasonable provocation and sudden combat was meaningless to the grand jury; they could not reasonably have been expected to evaluate its significance in deciding whether the evidence

complexity, because it may not be a simple determination whether the Commonwealth has established probable cause on the element of malice. Justice Spina wishes to diminish this complexity by withholding from the grand jury the legal instructions that will enable them to know that a killing is without malice if committed in a heat of passion arising from reasonable provocation or sudden combat. *Post* at 849. I do not think simplicity is a virtue where it derives from ignorance of the law, especially where knowledge of the law would allow the grand jury to appreciate the complexity of their indictment decision arising from strong evidence of mitigating circumstances.

[6]These due process concerns are particularly salient in this case, as Justice Lenk notes in her concurrence, see *ante* at 824-828, because the person indicted is a juvenile and the decision whether to charge him with murder or manslaughter has significant repercussions for the type of proceedings and sentences to which he will be exposed.

warranted an indictment charging murder in the second degree rather than voluntary manslaughter. Where, as here, the evidence of reasonable provocation and sudden combat is so strong that the absence of legal instruction regarding their significance probably influenced the jury's decision to return an indictment of murder in the second degree, I conclude that the integrity of the grand jury was impaired by the prosecutor's failure to provide the necessary legal guidance, and that due process requires dismissal of the indictment without prejudice.

SPINA, J. (concurring in part and dissenting in part, with whom Ireland, C.J., and Cordy, J., join). I agree that the evidence presented to the grand jury supports the indictment for murder in the second degree. I do not agree with Justice Gants, who would hold that in all cases where the Commonwealth seeks an indictment for murder and there is substantial evidence of mitigating circumstances or defenses (except lack of criminal responsibility), the grand jury must be instructed on the effect of mitigating circumstances and defenses. In my opinion the usual instructions on the elements of murder are all that need to be given. I agree with so much of Justice Lenk's analysis that reaffirms our jurisprudence that generally rejects any requirement that the Commonwealth present evidence to the grand jury concerning mitigating circumstances or defenses, or that the grand jury be instructed as to such mitigating circumstances or defenses absent a specific request from the grand jury. I disagree with Justice Lenk's analysis that an exception to the general rule must be made where a prosecutor seeks to indict a juvenile for murder because of special circumstances arising from the juvenile's status. In such cases Justice Lenk would require the grand jury to be instructed as to the effect of any mitigating circumstances or defenses (except lack of criminal responsibility) that are raised by the evidence. See *ante* at 832-833 & note 29 (Lenk, J., concurring). I will address first the opinion of Justice Gants, then the opinion of Justice Lenk.

"The grand jury have the dual function of determining whether there is probable cause to believe a crime has been committed and of protecting citizens against unfounded criminal

prosecutions." *Lataille* v. *District Court of E. Hampden*, 366 Mass. 525, 532 (1974). We have never defined the term "unfounded criminal prosecution." We have said only that in order to protect against unfounded criminal prosecutions, "at the very least the grand jury must hear sufficient evidence to establish the identity of the accused, . . . and probable cause to arrest him" (citations omitted). *Commonwealth* v. *McCarthy*, 385 Mass. 160, 163 (1982).

The grand jury are a body whose function is "limited." *Commonwealth* v. *Wilcox*, 437 Mass. 33, 39 (2002). The grand jury are "an investigatory and accusatory body only. It cannot and does not determine guilt." *Id.*, quoting *Brunson* v. *Commonwealth*, 369 Mass. 106, 120 (1975). See *Commonwealth* v. *Geagan*, 339 Mass. 487, 497, cert. denied, 361 U.S. 895 (1959). The nature of the grand jury is largely "historical and practical." *Commonwealth* v. *McLeod*, 394 Mass. 727, 733, cert. denied sub nom. *Aiello* v. *Massachusetts*, 474 U.S. 919 (1985). Generally a court will not review an irregularity before a grand jury that can be addressed and corrected at a subsequent trial before a petit jury. See, e.g., *Commonwealth* v. *Knapp*, 9 Pick. 495, 495-496 (1830). See also *Commonwealth* v. *McLeod, supra*; *Commonwealth* v. *Geagan, supra* at 499. Review of grand jury proceedings is disfavored because "the delays and complexity of criminal trials would be greatly increased, and no correspondingly useful purpose would be served." *Id.*, quoting *Commonwealth* v. *Woodward*, 157 Mass. 516, 519 (1893). See *Commonwealth* v. *Noble*, 429 Mass. 44, 48 (1999); *Tucker's Case*, 8 Mass. 286, 287 (1811).

Examples of this "practical" view of grand jury proceedings are as follows. A grand juror need not have heard all the evidence presented against a defendant in order to vote to return an indictment. See *Commonwealth* v. *Wilcox, supra* at 34. A grand jury need not be entirely free of bias or prejudice, and may act on their own personal knowledge. *Commonwealth* v. *McLeod, supra* at 732-735. An indictment may be based on hearsay, even "solely on hearsay," *Commonwealth* v. *O'Dell*, 392 Mass. 445, 450-451 (1984), although direct testimony is preferred. See *Commonwealth* v. *St. Pierre*, 377 Mass. 650, 655-656 (1979). Generally, a court does not inquire into the adequacy or

competency of the evidence on which probable cause is based, as such matters may be addressed in the trial court. See *Commonwealth* v. *Salman*, 387 Mass. 160, 166 (1982); *Commonwealth* v. *McCarthy*, *supra* at 160-161; *Commonwealth* v. *Geagan*, *supra* at 495-499.

There are certain exceptions to the general rule of limited review of a grand jury's proceedings. This court has indicated that an indictment might be set aside, usually without prejudice,[1] where a defendant makes a showing that the integrity of the grand jury proceedings was impaired. This is a "case by case" inquiry. See *Commonwealth* v. *Mayfield*, 398 Mass. 615, 620 (1986). Impairment is usually based on the conduct of the prosecutor. For example, an indictment may be dismissed if false or deceptive evidence were presented knowingly or recklessly to the grand jury and such evidence probably influenced the grand jury's decision to indict. See *id.* at 621-622. See also *Commonwealth* v. *Salman*, *supra* at 167 ("If it becomes known to the prosecution that false testimony was knowingly used to obtain an indictment, it is the duty of the prosecutor to advise the court and request a dismissal of the indictment"). Similarly withholding an exculpatory[2] portion of a defendant's statement and repeating the inculpatory portion to the grand jury in a way that distorted its import may be so unfair and misleading that an indictment may not be allowed to stand where the distortion probably affected the decision to indict. See *Commonwealth* v. *O'Dell*, *supra* at 446-447. An indictment also may be dismissed if known exculpatory evidence is withheld that would greatly undermine the credibility of an important witness on whose testimony the decision to indict probably depended. See *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984).

The conduct of the grand jury themselves may require setting aside an indictment. We have suggested that an indictment may

[1]Whether an indictment should be dismissed with prejudice may require a showing of such wilful deception or egregiousness that the Commonwealth should be precluded from seeking to reindict. See *Commonwealth* v. *O'Dell*, 392 Mass. 445, 447 (1984), and cases cited.

[2]Prosecutors are not required in every instance to present to the grand jury all possible exculpatory evidence of which they are aware. See *Commonwealth* v. *Connor*, 392 Mass. 838, 854 (1984); *Commonwealth* v. *O'Dell*, *supra*. See also *Commonwealth* v. *Wilcox*, 437 Mass. 33, 37 (2002).

not be allowed to stand where a defendant has made a prima facie showing of bias or prejudice on the part of the grand jury "so egregious as to result in an indictment based on 'hatred or malice,' within the meaning of G. L. c. 277, § 5," and thus in violation of the oath of the grand jury. *Commonwealth* v. *Mc-Leod, supra* at 734.

The question in this case is not whether the integrity of the grand jury was impaired by misconduct that unfairly resulted in an indictment. Rather, the question here is whether the failure to instruct the grand jury on manslaughter, for which there is no duty, nevertheless is so unfair that the integrity of the grand jury is impaired and the only remedy is to impose such a duty. It is settled that the "Commonwealth is not required to present evidence of so-called defenses or otherwise disprove such matters before the grand jury." *Commonwealth* v. *Silva*, 455 Mass. 503, 511 (2009). Specifically, the Commonwealth is not required to inform a grand jury of the differences between murder and manslaughter or the relevance of intoxication. See *Commonwealth* v. *Bousquet*, 407 Mass. 854, 860 (1990). See also *Commonwealth* v. *Coleman*, 434 Mass. 165, 172 (2001) (prosecutor's duty is to present evidence and explain meaning of law concerning indictment sought); *Commonwealth* v. *Noble, supra* at 48 (Commonwealth not required to inform grand jury as to lesser included offense for which it seeks indictment, unless requested); *Commonwealth* v. *Smith*, 414 Mass. 437, 441 (1993) (same); *Attorney Gen.* v. *Pelletier*, 240 Mass. 264, 310 (1922) (same). Where, as here, the evidence presented to the grand jury supports an indictment for murder in the second degree, there is nothing unfair about not informing the grand jury about the elements of manslaughter.[3]

The accusation of murder in the second degree has been supported by probable cause to arrest for that crime. A grand jury are not entitled simply to choose between murder and manslaughter where the Commonwealth has presented credible evidence to support an accusation of murder in the second degree. *Ante* at 836 (Gants, J., concurring). A petit jury, which determine guilt, normally would be instructed to return a verdict for

---

[3]Of course, an instruction should be given if requested by the grand jury. See *Commonwealth* v. *Noble*, 429 Mass. 44, 48 (1999), and cases cited.

the highest crime proved beyond a reasonable doubt against the defendant. See *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797 (1977). The grand jury, which are merely an accusatory body that do not determine guilt, do not have greater power than a petit jury in this regard.

To the extent Justice Gants would allow a grand jury to weigh the evidence and resolve any conflict in favor of manslaughter rather than murder where there is substantial evidence of mitigation, *ante* at 841 n.3, this would require a presentation to the grand jury that is more like a preliminary trial in its complexity than a determination of probable cause to arrest — the decision faced by a police officer who is about to make an arrest. The issue has become not whether there was probable cause to arrest for murder, but whether an officer more precisely and after deliberation should have arrested for murder or for manslaughter. A police officer typically has neither the time nor the facts to make such a decision.

The United States Supreme Court has said:

"In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . Probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed. . . . These long-prevailing standards seek to safeguard citizens from rash and unreasonable interference with privacy and from unfounded charges of crime. They also seek to give fair leeway for enforcing the law in the community's protection. Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability. The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests. Requiring

more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice."

*Brinegar* v. *United States*, 338 U.S. 160, 175-176 (1949), quoting *Carroll* v. *United States*, 267 U.S. 132, 162 (1925). The burden this places on prosecutors and the grand jury to sort out whether the defendant should have been arrested for murder versus manslaughter is a complex exercise that needlessly squanders dwindling resources for no discernibly useful purpose. The only question for the grand jury should be whether the evidence was sufficient to support a decision to arrest for murder. Any inquiry and decision beyond that is in the nature of an adjudicatory decision and appropriately should be reserved for the petit jury. A grand jury have no greater responsibility than a police officer when acting on probable cause to arrest. The officer has no duty to investigate and deliberate over possible defenses. See *Baker* v. *McCollan*, 443 U.S. 137, 145-146 (1979).

The legal authority on which Justice Gants primarily relies, *State* v. *Hogan*, 336 N.J. Super. 319, 340-343, 344 (App. Div.), cert. denied, 167 N.J. 635 (2001), does not support his theory. *Ante* at 842-843. That case establishes a duty on the part of a prosecutor to instruct a grand jury as to only those defenses "that would, if believed, result in a finding of *no* criminal liability, i.e., a *complete* exoneration" (emphasis added). *State* v. *Hogan*, *supra* at 342. As to complete, or "exculpatory" defenses, *id.*, the prosecutor's duty arises "only when the facts known to the prosecutor *clearly* indicate or *clearly* establish" that the accused acted in a manner contemplated by such defense (emphasis added). *Id.* at 343. There is no duty to instruct the grand jury where the defense is a "mitigating" defense, that is, one that, if believed, would not result in a finding of *no* criminal liability, or complete exoneration. See *id.* at 342. Thus, the role of the grand jury to eliminate a "needless or unfounded prosecution" requires that they confine themselves only to those defenses that would result in complete exoneration, not those that merely mitigate the degree of guilt.[4] See *id.* at 341-342. See also *People* v. *Valles*, 62 N.Y.2d 36, 38-39 (1984).

[4]In *Commonwealth* v. *Landry*, 438 Mass. 206, 211 (2002), we said that

Massachusetts jurisprudence regards heat of passion, reasonable provocation, and sudden combat as mitigating circumstances, not complete defenses. "Voluntary manslaughter is . . . 'an *intentional killing*, which is mitigated by extenuating circumstances' " (emphasis in original). *Commonwealth* v. *Whitman*, 430 Mass. 746, 753 (2000), quoting *Commonwealth* v. *Squailia*, 429 Mass. 101, 109 (1999). Heat of passion, reasonable provocation, and sudden combat are considered defenses, grounded in the recognition of human frailty, which palliate malice. See *Commonwealth* v. *Webster*, 5 Cush. 295, 304 (1850). Thus, there is no basis under *State* v. *Hogan*, *supra*, to require a prosecutor in this case to instruct the grand jury on manslaughter. As the court said in that case when discussing why it would not require prosecutors to instruct a grand jury even as to complete defenses that were not "clearly establish[ed]," "[i]t is unrealistic to call upon a prosecutor to provide the grand jury with a sophisticated analysis of the law where he does not have the benefit of the views of the defense to warn him of potential problems and pitfalls." *State* v. *Hogan*, *supra* at 343-344. *State* v. *Hogan* is consistent with our jurisprudence. See *Commonwealth* v. *Geagan*, 339 Mass. 487, 499, cert. denied, 361 U.S. 895 (1959), quoting *Commonwealth* v. *Knapp*, 9 Pick. 495, 495-496 (1830).

This analysis is even more compelling as to mitigating, or incomplete defenses, such as heat of passion, reasonable provocation, and sudden combat. "By its very nature, the grand jury does not consider a full and complete adversarial presentation, 'and the instructions are not made after consideration [and with the benefit] of the views of the defense.' " *State* v. *Hogan*, *supra* at 343, quoting *State* v. *Schmidt*, 213 N.J. Super. 576, 584 (App. Div. 1986), rev'd on other grounds, 110 N.J. 258 (1988). A requirement that the grand jury be instructed on the elements of voluntary manslaughter in this case[5] is a significant departure

probable cause to arrest for a violation of G. L. c. 94C, § 27 (*a*), does not exist when a person presents a facially valid exchange program membership card, absent evidence that the card is invalid or the bearer is not entitled to possess it. Arguably, a grand jury would have to be so instructed when such a "complete" defense is clearly established, to avert an "unfounded prosecution."

[5] Justice Gants views the circumstances of this case as "rare." *Ante* at 843. Voluntary manslaughter is hardly "rare," and mitigating circumstances not unlike those presented here arise with considerable frequency.

from the historic and practical nature of the grand jury, it calls on the grand jury to perform more than an accusatory or investigative function, and it needlessly and unfairly burdens police and prosecutors to develop murder cases before learning about a defendant's case through reciprocal discovery. It is more consonant with public justice to sort out these issues at a subsequent trial.

Justice Lenk would create a new rule to give grand jurors "suitable tools for their enhanced task" of "decid[ing] whether [a juvenile should] be treated for all purposes as an adult," *ante* at 832, and which would establish the grand jury as the "sole gatekeeper between the adult and juvenile justice systems." *Ante* at 824. This new rule would have the practical effect of forcing prosecutors to present precisely the type of evidence needed to disprove any defenses or mitigating circumstances that Justice Lenk acknowledges is not required under our jurisprudence. Justice Lenk's view to the contrary, without such evidence the newly equipped grand jury will have an open invitation to reject an otherwise properly supported murder indictment. It is not even clear if the grand jury should be instructed to return an indictment for the highest crime shown, or if they have unfettered powers of charge nullification. Cf. *Commonwealth* v. *Dickerson*, 372 Mass. 783, 797 (1977) (petit juries should be instructed to return verdict of highest crime proved beyond reasonable doubt).

In advocating this gatekeeper role for the grand jury, reliance is placed in part on the procedure that existed under the statute that governed juvenile transfers prior to the enactment of the youthful offender act in 1996. As she notes, prior to 1996, transfer of a juvenile under G. L. c. 119, § 61, as amended by St. 1991, c. 488, § 3, for trial as an adult required a two-step adversary process. See *Commonwealth* v. *Clifford C.*, 415 Mass. 38 (1993). The first step required a judge of the Juvenile Court to determine if there was probable cause to believe the juvenile committed the offense in question. *Id.* at 39-40. If the judge found probable cause, the judge then considered the issues of the juvenile's dangerousness and amenability to rehabilitation. At this second phase of the transfer hearing a prosecutor could present evidence of the juvenile's prior record, history of violence

as well as evidence of nonviolent criminal conduct, aggressive tendencies, behavioral problems, and any other type of evidence relating to dangerousness and amenability to rehabilitation. Evaluations or opinions of experts also were admissible. Of course, the juvenile could contest such evidence and present his own evidence. *Id.* at 40-46. None of this material can be presented to the post-1996 gatekeeper grand jury, and Justice Lenk does not suggest otherwise. However, this leaves unanswered the question how the grand jury are to perform their role as gatekeeper, a judicial role that appears to be well beyond the traditional role of the grand jury as "an informing and accusing body." *Commonwealth* v. *Geagan, supra* at 497, quoting *Commonwealth* v. *Woodward,* 157 Mass. 516, 517 (1893). See *Lataille* v. *District Court of E. Hampden,* 366 Mass. 525, 532 (1974).

A point is made that "[t]he grand jury returned the murder indictment that the Commonwealth sought without the defendant's status as a juvenile having been factored into the process in any manner," but no meaningful insight or guidance is offered as to how the grand jury should go about making an informed decision in this regard. *Ante* at 827. To complicate matters further, the questions of how judicial review of the decision of the gatekeeper grand jury may be pursued, and the standard of review, are not addressed. General Laws c. 119, § 61, once governed transfer hearings, but that statute was repealed by St. 1996, c. 200, § 7. There is nothing in its place because there was a comprehensive overhaul of the juvenile justice system, and as to murder, the Legislature determined that a direct indictment was all that was needed.

I believe there are two flaws in the rationale behind the gatekeeper grand jury. One is the statement that "the animating purpose of [three recent Supreme Court[6]] cases appears to be an effort to foreclose 'criminal procedure laws that fail to take defendants' youthfulness into account at all.' " *Ante* at 831, quoting *Graham* v. *Florida,* 130 S. Ct. 2011, 2031 (2010). Justice Lenk further states, "There is, however, no reason to think that the factors taken into account by the United States Supreme

---

[6]*Miller* v. *Alabama,* 132 S. Ct. 2455 (2012). *Graham* v. *Florida,* 130 S. Ct. 2011 (2010). *Roper* v. *Simmons,* 543 U.S. 551 (2005).

Court . . . are without force when considering whether it is appropriate for the grand jury to receive legal instruction before rendering a decision to indict a juvenile for murder." *Ante* at 831 note 27. I disagree. The cases involved, and the factors discussed by the Supreme Court in those cases, focused exclusively on sentencing and the application of the prohibition in the Eighth Amendment to the United States Constitution against cruel and unusual punishment to certain juvenile defendants who had been charged as adults. It is axiomatic that the decision to charge someone is not punishment. Therefore, neither the Eighth Amendment prohibition against cruel and unusual punishment nor Eighth Amendment jurisprudence should apply to the return of an indictment.[7]

The reliance on the trilogy of Supreme Court cases is unpersuasive. In *Miller* v. *Alabama*, 132 S. Ct. 2455, 2464 (2012), the Court was careful to point out that *Roper* v. *Simmons*, 543 U.S. 551 (2005), and *Graham* v. *Florida, supra,* "establish that children are constitutionally different from adults *for purposes of sentencing*" (emphasis added). The Supreme Court never intimated that its reasoning in these cases could be applied in other contexts, such as the decision to charge a juvenile as an adult offender. Moreover, the Supreme Court never suggested in those cases that there was any flaw in the procedure by which the juvenile defendants had been prosecuted as adults. Indeed, in *Miller*, which addressed mandatory life sentences for juveniles with no possibility of parole, the Court indicated that a mandatory life sentence for juveniles was permissible on a conviction of murder. It merely held that an individualized hearing must first be afforded before the possibility of parole could be foreclosed. *Miller, supra* at 2471.

It is significant that there has been no mention (nor could there be) that, as a matter of constitutional law, the Supreme Court's trilogy of Eighth Amendment cases requires prosecutors to instruct grand juries as to defenses or mitigating circumstances when seeking a murder indictment against juveniles. To be clear, today's decision is not based on a constitutional requirement.

What I believe to be the second flaw in the rationale for the

---

[7]It bears mention now that there are no sentencing implications of a murder indictment, only a murder conviction, a point to which I will return.

gatekeeper role of the grand jury begins with the degree of emphasis on the differences between the juvenile justice system and the adult criminal justice system, and certain protections that the defendant will lose by virtue of being indicted for murder. Massachusetts already provides more protections to juveniles than is constitutionally required.[8] The defendant is hardly wanting for protections. If there is any concern about the loss of a particular protection, e.g., closed court rooms, then such a loss should be addressed specifically, but it is not. Indeed, an open court room is itself a valued protection. See *Commonwealth* v. *Cohen (No. 1)*, 456 Mass. 94, 106 (2010).

Moreover, and of special significance, there is no possibility that the defendant will be convicted of murder in the first degree. The district attorney, acting commendably within his discretion, sought an indictment only for murder in the second degree. Although a conviction of that offense may result in a mandatory sentence of life in prison, parole is available. See G. L. c. 265, § 2. Thus, where the conviction is of murder in the second degree, there is no constitutional infirmity in such a sentence. See *Miller* v. *Alabama, supra* at 2474. Also significant is the fact that if the defendant is not convicted of murder in the second degree but of a lesser included offense, including manslaughter, the Superior Court judge would have all the sentencing options available to a judge in the Juvenile Court, including commitment to the Department of Youth Services.

---

[8]The Supreme Court has said that although the due process clause of the Fourteenth Amendment to the United States Constitution applies to Juvenile Court proceedings, that does not mean that juvenile hearings must conform with all the requirements of a criminal trial. What is required are the essentials of due process and fair treatment, which include (1) the right to adequate and timely notice of the charges, (2) the privilege against self-incrimination, (3) the right to assistance of counsel, and (4) the right to confront and cross-examine witnesses. See *In re Gault*, 387 U.S. 1, 33-57 (1967). Juveniles are also entitled not to be convicted except by proof beyond a reasonable doubt. See *In re Winship*, 397 U.S. 358, 365-367 (1970). Principles of double jeopardy also apply. See *Breed* v. *Jones*, 421 U.S. 519 (1975). Trial by jury is not constitutionally required in juvenile proceedings, see *McKeiver* v. *Pennsylvania*, 403 U.S. 528, 545-550 (1971), but it is made available in Massachusetts by statute. See G. L. c. 119, § 55A. In addition, the Massachusetts Rules of Criminal Procedure have been made applicable to juvenile proceedings in the Commonwealth. See Mass. R. Crim. P. 1 (b), as appearing in 442 Mass. 1501 (2004).

See G. L. c. 119, §§ 58, 72B. This is yet another protection available to the defendant. Justice Lenk tries to minimize this by implying that Superior Court judges lack the special expertise of Juvenile Court judges when it comes to sentencing, but the Legislature seems to think otherwise, and the assignment of responsibility for the decision is theirs to make. *Ante* at 828-831. Moreover, there is no basis to believe the grand jury possess any special expertise, or indeed any expertise, in juvenile matters that exceeds that of Superior Court judges.

The minimal acknowledgment of the rights the defendant actually enjoys, together with the conflation of the charging process with the sentencing process, culminates in a mantra that the defendant "will be treated as an adult for all purposes." This appears in various forms at least three times in three consecutive paragraphs. *Ante* at 831-832 (Lenk, J., concurring). As indicated above, these Eighth Amendment cases suggest no such thing, nor is there even a colorable analogy to be made to the charging process. To the extent this mantra may be an expression of the view that it is impermissible to treat a juvenile as an adult for all purposes, it is not entirely a correct statement of law. A juvenile may indeed be treated as an adult for all *permissible* purposes for the crime of murder. No purpose has been identified in this case that is impermissible.

Finally, the statement that the prosecutor "bypassed the Juvenile Court and any attendant protections for this defendant" is not entirely fair. *Ante* at 832 (Lenk, J., concurring). The prosecutor acted conformably with the youthful offender act of 1996. A perception that the 1996 amendment involved here somehow deprives juveniles of certain protections should not serve as a basis to undo what the Legislature did. The Legislature was free to withdraw any protection it once offered. The Legislature's determination that the prosecution of a juvenile accused of committing murder when he was between the ages of fourteen and seventeen years may proceed directly by indictment is a proper exercise of the legislative function. There is no claim otherwise, and there is no constitutional basis to conclude otherwise. We have recognized the broad power of the Legislature in this area. See, e.g., *Charles C.* v. *Commonwealth*, 415 Mass. 58, 69-70 (1993). The Supreme Court has acknowledged that

Massachusetts is one of fourteen States that proceed in this manner, yet it never hinted there might be any impropriety in the chosen process. See *Miller* v. *Alabama,* 132 S. Ct. 2455, 2474 & n.15 (2012).

The Legislature is presumed to have known of the traditional role of the grand jury when it enacted the youthful offender act in 1996, yet it did not expand that role for cases in which a prosecutor seeks to indict a juvenile for murder. Instead, it streamlined the transfer process for a narrow class of crimes, namely, murder. Any rationale for expanding the role of the grand jury to act as gatekeeper in the transfer process is inconsistent with the 1996 legislation. As such, insofar as today's decision depends in part on that expansion, it is based on an improper judicial exercise of the legislative function. In my view, the court violates the separation of powers provision of art. 30 of the Massachusetts Declaration of Rights by burdening the transfer process created by the Legislature, namely, indictment on the presentation of evidence of probable cause to arrest for murder.